(216 P.3d 671)
No. 100,286

KEELY FOSTER, a Minor, through her Parents and Natural Guardians, Kim Foster and Kevin Foster, and Individually on their own behalf, *Appellants*, v. MICHELLE A. KLAUMANN, M.D., *Appellee*.

Opinion filed September 11, 2009.

W.J. *Fitzpatrick*, of Fitzpatrick and Bass, of Independence, and *Douglas A. Buxbaum* and *John M. Fitzpatrick*, of Buxbaum, Daue & Fitzpatrick, PLLC, of Missoula, Montana, for appellants.

*Michael R. O'Neal* and *Shannon L. Holmberg*, of Gilliland & Hayes, P.A., of Hutchinson, for appellee.

*Kyle J. Steadman*, of Foulston Siefkin, LLP, of Wichita, for *amicus curiae* Kansas Association of Defense Counsel.

*James R. Howell*, of Prochaska, Giroux & Howell, of Wichita, and *David R. Morantz* and *Matthew E. Birch*, of Shamberg, Johnson & Bergman, of Kansas City, Missouri, for *amicus curiae* Kansas Association for Justice.

Before GREENE, P.J., PIERRON and GREEN, JJ.

GREEN, J.: In this medical malpractice case, Keely Foster, a minor, through her parents and natural guardians, Kim Foster and Kevin Foster (collectively the Fosters), and individually on their own behalf appeal from a jury verdict rendered in favor of Dr. Michelle Klaumann. In addition, the Fosters appeal from the trial court's judgment denying their motion for a new trial. This case turns on the giving of two jury instructions—the general physician standard of care instruction and the "best judgment instruction." We determine that the giving of both the specialist and the general physician standard of care jury instructions likely confused the jury and affected its verdict in the case. Moreover, based on the factual issues that needed to be resolved in this case, the giving of the best judgment jury instruction could have served to confuse the jury by injecting subjectivity into a standard of care that is supposed to be objective. The giving of those two jury instructions constitute reversible error under the particular facts of this case. Accordingly, we reverse and remand for a new trial.

The Fosters also raise several other arguments, including that the trial court erred in admitting expert witness testimony, that they were substantially prejudiced by a violation of the trial court's order in limine, that the trial court erred in refusing to give a modified informed consent instruction to the jury, and that the jury's verdict was contrary to the law and evidence. We find no reversible error on those issues.

*Hereditary Condition*

Keely suffered from a hereditary condition called multiple hereditary exostosis, which is also called multiple hereditary osteochondromas. With this condition, bumps made of bone and cartilage grow around the ends of the long bones of the body. The osteochondromas typically grow until the child stops growing. With this condition, the osteochondromas can cause pain; cosmetically unacceptable growths; discrepancies in arm and leg lengths;

"knock-kneed" or "bowlegged" legs; and joint dislocation. Keely's mother, grandfather, uncles, and cousins all suffered from this hereditary condition. Kim Foster and her family members have previously had surgeries to remove osteochondromas.

*Dr. Klaumann's Care and Treatment of Keely*

Kim first took Keely to see Dr. Klaumann, a pediatric orthopedic surgeon, in April 1999 about osteochondromas on Keely's legs and shoulder. Keely was 5 years old at the time. Dr. Klaumann practiced with Advanced Orthopedic Associates and was board certified and recertified in her specialty. Dr. Klaumann had several patients who she regularly treated with multiple hereditary osteochondromas.

At the April 1999 visit, Dr. Klaumann took x-rays and examined Keely. Dr. Klaumann recommended that Keely schedule another appointment in about 6 months. Keely had medical appointments with Dr. Klaumann at least once a year between 1999 through 2004.

During a visit in May 2004, Keely complained to Dr. Klaumann about pain in her left fibula. During this visit, Dr. Klaumann took x-rays, which revealed a mass on Keely's tibia and fibula. On March 23, 2005, Kim took Keely to see Dr. Klaumann due to pain in Keely's knee. Keely had been having pain in her knee for 2 to 3 months whenever she walked up the stairs or rode her bike. In addition, Keely had been having pain in her left femur whenever her brother crawled on her lap. Keely had been taking over-the-counter pain medications on a daily basis.

Upon taking x-rays at the March 23, 2005 visit, Dr. Klaumann noticed that the osteochondromas around Keely's hip and knee were larger and that Keely also had a large hook-shaped osteochondroma between the tibia and fibula. Although Dr. Klaumann was unable to palpate the hook-shaped osteochondroma, Keely felt tenderness and experienced pain in that area. Dr. Klaumann was concerned that the hook lesion might be involved with the peroneal nerve. Keely had good range of motion and did not have any numbness, tingling, or weakness in that area.

At this visit, Dr. Klaumann recommended that Keely undergo surgery to remove the osteochondromas over her lateral femur, the hook-shaped one between her tibia and fibula, and the one on her fibula. Dr. Klaumann told Kim that the hook-shaped osteochondroma could be pressing against a nerve. Kim testified that she asked Dr. Klaumann what would happen if they did not do surgery, and Dr. Klaumann told her that the osteochondroma could eventually press the two bones apart and that Keely could lose her foot. According to Kim, she understood that Dr. Klaumann was only going to remove two osteochondromas during the surgery. Kim testified that Dr. Klaumann never told her that one of the risks of surgery was permanent nerve injury.

*May 19, 2005, Surgery*

Keely underwent surgery to remove the osteochondromas on May 19, 2005. The day before surgery, Dr. Klaumann faxed a document to the hospital pertaining to Keely's history and physical examination. In order to perform surgery at the hospital, Dr. Klaumann had to submit the document. Part of the document contained a checklist with one of the items being that Dr. Klaumann had discussed the risks, benefits, alternatives, and complications with Keely. Dr. Klaumann checked the item and wrote "with mom." According to Dr. Klaumann, she answered the questions on that document based on her conversations with Kim at the March 23, 2005, appointment.

According to Kim, Keely continued experiencing pain in her knee right up until the surgery. Just before surgery, Dr. Klaumann spoke with Kim, and the decision was made to remove another osteochondroma on the proximal tibia. Thus, the plan on the morning of surgery was for Dr. Klaumann to remove five osteochondromas (instead of four) in three incisions (instead of two). Dr. Klaumann testified that she talked with Kim again about the risks of surgery, especially the risk of nerve damage in removing the osteochondroma between the tibia and fibula.

On the other hand, Kim testified that Dr. Klaumann never discussed the risks of surgery with her. Kim acknowledged that just before the surgery, the anesthesiologist had gone over the risks of

anesthesia with her and had her sign a consent form. Kim further acknowledged that she had signed a surgical consent form given to them by a receptionist at the registration desk on the morning of surgery. Part of the surgical consent form contained a paragraph that the nature of the ailment; the nature and purpose of the proposed procedure; the possible alternative procedures; the risks of unfortunate results, possible complications, and unforeseen physical conditions within the body; and the possibility of success had been explained. Nevertheless, the receptionist did not discuss the risks of surgery with Kim or her husband. Kim testified that if Dr. Klaumann had told her that a risk of the surgery was permanent nerve injury, she would have taken Keely for a second opinion.

*Keely's Postoperative Care*

Kim testified that immediately after the surgery, Dr. Klaumann told her that she had removed five osteochondromas, that Keely was doing well, and that she "really had to stretch that nerve to get that one tumor out." Later, after Keely had been in the recovery room, Dr. Klaumann told Kim that she had been unable to get Keely to move her left foot and reiterated that she "really had to stretch that nerve" during the surgery. According to Kim, Dr. Klaumann called her three times during the week following the surgery to check if Keely could move her toes or wiggle her foot.

Kim testified that during one of Dr. Klaumann's phone calls, Dr. Klaumann stated that she "really had to stretch that nerve" but did not think she had damaged anything. Kim asked Dr. Klaumann when they would know if there had been damage, and Dr. Klaumann responded that only time would tell. According to Kim, she asked Dr. Klaumann if she should take Keely to another specialist, but Dr. Klaumann did not recommend that Kim do so. Dr. Klaumann indicated that there was not a window of opportunity to fix the nerve.

On May 26, 2005, Kim took Keely in for an appointment with Dr. Klaumann because Keely was still unable to feel her foot. Keely could move her toes and put her foot down but could not dorsiflex (move up) her foot. At that visit, Dr. Klaumann gave Keely a black boot to keep her from dragging her toes. Dr. Klaumann told Kim

that Keely had a stretch injury and that she wanted to see Keely again in a month. During the weeks to follow, Keely was still unable to dorsiflex her foot and was barely able to evert (move out) her foot. Dorsiflexion is controlled by the deep peroneal nerve while eversion is controlled by the superficial peroneal nerve. Keely did not have dorsiflexion or eversion problems before the May 2005 surgery.

Keely saw Dr. Klaumann again on June 23, 2005. At that visit, Dr. Klaumann gave Keely orders for physical therapy. In addition to undergoing physical therapy, Keely saw Dr. Shah, a neurologist, in July 2005. Dr. Shah performed nerve conduction testing on Keely. According to Kim, based on the results of the nerve conduction test, Dr. Shah told her that Keely's nerve was dead and that she had a month to get Keely to a nerve specialist.

Based on Dr. Shah's statements, Kim made an appointment for Keely with Dr. Rahul Nath, a nerve specialist, in Houston, Texas, with surgery tentatively scheduled on August 23, 2005. Dr. Klaumann saw Keely again on August 1, 2005. After the appointment, Dr. Klaumann talked with Dr. Shah. Dr. Shah had documented that Keely had some eversion in her left foot, which she did not have in June, and also that her sensation was intact. According to Dr. Klaumann, Dr. Shah said that he wanted to discuss the improvements with Dr. Nath. Dr. Shah later canceled Keely's surgery with Dr. Nath.

Keely saw Dr. Dwight Lindholm, a neurologist, on August 18, 2005. At that visit, Keely was unable to dorsiflex her foot and could not extend any of her toes on her left foot. Keely was able to evert her foot slightly but not to full eversion. The next day, Dr. Lindholm did nerve conduction testing. Dr. Lindholm tested all four of the muscles controlled by the deep peroneal nerve but was unable to get any response. Dr. Lindholm did not see anything during the nerve conduction testing that would suggest to him that Keely's deep peroneal nerve was functioning. According to Dr. Lindholm, the nerve conduction testing confirmed what he had suspected during his physical exam of Keely, which was that the left deep peroneal nerve was either severed or severely injured so that it was unable to function. The left superficial peroneal nerve, which con-

trolled eversion, was in the process of recovering. Based on his findings, Dr. Lindholm recommended that they proceed with surgery with Dr. Nath as soon as possible in order to have the best chance of recovery.

*August 23, 2005, Surgery*

Dr. Nath saw Keely in his office on August 22, 2005, the day before her surgery. During his physical examination of Keely, Dr. Nath found that Keely had complete footdrop (was unable to dorsiflex her foot) on her left side but that she was able to slightly evert her foot. Based on those clinical findings, Dr. Nath categorized Keely's injuries as a complete deep peroneal nerve injury and a partial superficial peroneal nerve injury.

Keely's surgery was performed by Dr. Nath on August 23, 2005, and was initially an exploratory surgery. After locating the peroneal nerve, Dr. Nath performed nerve conduction testing directly on the beginning point of the deep peroneal nerve and the tibialis anterior muscle, the muscle that controls dorsiflexion. According to Dr. Nath, he was able to see a tiny bit of activity in the tibialis anterior muscle when the nerve was stimulated at 33 milliamps. Nevertheless, Dr. Nath testified that the normal kind of stimulation that he performs is 1 or 2 milliamps, so the stimulation at 33 milliamps was probably just a direct current effect along the fluid or blood. Based on these findings, it was determined that Keely's deep peroneal nerve was completed denervated.

Dr. Nath then proceeded to remove scar tissue and locate a tiny stump of the deep peroneal nerve, which was within the tibialis anterior muscle. Dr. Nath discovered that there was extensive scarring to the deep peroneal nerve and that it could not be connected to another normal nerve that was located higher in Keely's body. In addition, Dr. Nath removed a traumatic neuroma from Keely's nerve. According to Dr. Nath, a traumatic neuroma is caused by direct injury and usually takes several weeks to form. Dr. Nath's testimony indicated that later pathology testing on the traumatic neuroma indicated that Keely's injury was a complete injury.

During the surgery, Dr. Nath concluded that a nerve graft would not be an appropriate surgery based on the severity of Keely's in-

jury. Dr. Nath talked with Keely's parents and told them about some surgical options. Dr. Nath told Keely's parents that the best chance to get movement would be to reroute part of the superficial peroneal nerve into the deep peroneal nerve. The risk with that surgery was that it would not work for Keely, given the extent of her injury, and that she would have a higher chance of losing the movement that she did have. Keely's parents decided against that procedure and instead decided on a partial superficial peroneal nerve transfer to try to preserve Keely's eversion.

With this procedure, Dr. Nath spliced off a small segment of Keely's superficial peroneal nerve and relocated it into the bottom end of her transected deep peroneal nerve. Dr. Nath testified that although the chance of success with this procedure was 90 percent in most cases, it would be much less in Keely's case due to the severity of her injury. According to Kim, she understood that there was a 30 percent chance that the procedure might not work. Dr. Nath explained that the traumatic neuroma and the scarring extended farther down the length of Keely's nerve than most injuries.

Dr. Nath testified that he had taken care of hundreds of nerve stretch injuries and that Keely did not have a stretch injury to her deep peroneal nerve. According to Dr. Nath, Keely's injury "was a complete transection type of injury to the deep peroneal nerve." Dr. Nath's opinion that Keely suffered a complete transection injury to her deep peroneal nerve was based on the electrical testing during the surgery and the fact that Keely was unable to dorsiflex her foot, that the nerve was scarred and thickened, and that there was a traumatic neuroma on the nerve.

Dr. Nath testified that when there is an acute severe injury to a peripheral nerve, the chances of recovery are better with earlier treatment. Dr. Nath's opinion was that when there is a loss of function to a nerve immediately after surgery, the injury should be explored immediately.

Approximately 1 year after the August 2005 surgery, Dr. Nath spoke with Kim and learned that Keely's peroneal nerve function had not improved. Dr. Nath indicated that it was unlikely that any useful function would return to Keely's deep peroneal nerve. Dr. Nath recommended to Kim that Keely be evaluated for a tendon

transfer. Dr. Nath explained that in a tendon transfer procedure, the posterior tibial tendon is cut and rerouted to the front of the ankle and hooked to the bones or tendons at the front of the foot. According to Dr. Nath, this procedure should improve Keely's resting foot position and possibly eliminate the footdrop.

When the trial occurred in this case, Keely was in eighth grade and had not yet undergone the tendon transfer. Keely was still unable to dorsiflex her foot and still experienced footdrop. Keely testified that she had a brace but she preferred not to wear it because it was uncomfortable and embarassing. Keely further testified that she no longer rode a bike because she could not keep her foot on the pedals, that she no longer roller skated because of her foot problem, that her foot caused her to trip, and that she could not wear flip flops. Keely still had about 10 osteochondromas in her body.

## Commencement of Lawsuit

In May 2006, the Fosters sued Dr. Klaumann on claims of medical malpractice. The following claims ultimately went to the jury: (1) that Dr. Klaumann failed to give and document an appropriate informed consent for osteochondroma removal surgery; (2) that Dr. Klaumann surgically removed osteochondromas without proper indication; (3) that Dr. Klaumann failed to appropriately identify and protect neurovascular structures during the operation; (4) that Dr. Klaumann caused a functionally complete and permanent injury to Keely's deep peroneal nerve and partially injured her superficial and common peroneal nerve; and (5) that Dr. Klaumann failed to properly and timely treat Keely's nerve injury and to refer Keely to a doctor who specialized in nerve injury.

## Defense Expert Dr. Mackinnon

Kim took Keely to St. Louis to see Dr. Susan Mackinnon in July 2006 after Kim had read an article in U.S. News & World Report about a nerve transplant procedure that Dr. Mackinnon had performed. Dr. Mackinnon saw Keely for one 15-minute appointment; apparently, a nerve transplant was not an option based on the fact that Dr. Nath had already performed the nerve transfer surgery.

Dr. Mackinnon referred Keely to an orthopedic foot doctor for an evaluation for a tendon transfer.

Over the Fosters' objection, Dr. Mackinnon testified as an expert witness for Dr. Klaumann at trial. Dr. Mackinnon testified that in her opinion, Dr. Klaumann had not deviated from the standard of care. Dr. Mackinnon testified that when getting a tumor out that is between two branches of the peroneal nerve, the surgeon has to use retractors, which can cause the nerve to go to sleep for a period of time or forever. Dr. Mackinnon disagreed with Dr. Nath's conclusion that there had been a clear transection to Keely's deep peroneal nerve. Instead, according to Dr. Mackinnon, Dr. Nath's findings were consistent with a retraction or stretch injury to the deep peroneal nerve.

Dr. Mackinnon's opinion was that Dr. Klaumann had complied with the standard of care in her postoperative management and follow-up of Keely. According to Dr. Mackinnon, after Dr. Shah had done the electrical study 6 weeks following the May 2005 surgery and part of the nerve seemed to be getting better, the appropriate standard of care was to follow the nerve along instead of surgically evaluating the nerve again in the early postoperative period. Dr. Mackinnon testified that doing a surgical evaluation very soon after the first surgery could actually make things worse based on the amount of scar tissue. Dr. Mackinnon indicated that sometimes a nerve will not work immediately postoperatively when a surgeon takes a tumor out from within the nerve and uses retractors on the nerve, even when the surgeon has observed that the nerve is intact. According to Dr. Mackinnon, it is within the standard of care to observe the nerve for 3 months to see if there is evidence of the nerve getting better. At that point, if the nerve is getting better, the nerve should be followed and electrical studies should be repeated. If things do not look better, then a decision to operate should be made.

*Plaintiffs' Expert Dr. Yassir*

Dr. Walid Yassir, the chief of pediatric orthopedics and scoliosis surgery at Tufts New England Medical Center, testified as an expert witness for the Fosters. Dr. Yassir's opinion was that Dr.

Klaumann had not complied with the standard of care as to the indications (reasons) for surgery. Dr. Yassir testified that Dr. Klaumann's decision-making process in performing the surgery had been poorly documented. Although Dr. Klaumann had testified in her deposition that there had been some widening in the joint spaces between Keely's tibia and fibula in her left leg, Dr. Yassir pointed out that the widening in the right leg was actually much larger.

Dr. Yassir noted that Dr. Klaumann's stated reason for the operation was pain in certain areas. Nevertheless, Dr. Yassir indicated that Dr. Klaumann could not diagnose whether a growth was impinging on one of the nerves by simply looking at x-rays. Dr. Yassir testified that in order to make a definitive diagnosis as to whether a growth was impinging on a nerve, a doctor could do a CAT scan, an MRI, or nerve conduction testing. Dr. Yassir further testified that a physical exam would be another way to determine whether a growth was impinging on a nerve. Dr. Yassir pointed out, however, that Dr. Klaumann's physical exam revealed that everything was working normally in Keely's leg before the surgery. According to Dr. Yassir, it was never proven by appropriate medical testing that the osteochondroma between the fibia and the tibula was actually causing a problem. Dr. Yassir testified that in a situation like the present case, there should be documentation that the osteochondroma is causing a major problem because the surgery is so dangerous.

Dr. Yassir testified that there was no documentation in Keely's medical records that a meaningful informed consent discussion had taken place with Dr. Klaumann before Keely's surgery. According to Dr. Yassir, the document offered by Dr. Klaumann to show that she had discussed the risks of surgery with the Fosters was inadequate. Dr. Yassir indicated that in order to prove informed consent, a doctor needs to enumerate the risks and benefits, the alternatives, and the possible complications of the surgery. According to Dr. Yassir, based on the type of surgery that was performed on Keely, the standard of care would require Dr. Klaumann to disclose the risk of permanent injury to the peroneal nerve.

Dr. Yassir's opinion was that Dr. Klaumann's surgical care was substandard. Dr. Yassir explained that his opinion was based on the fact that Keely woke up with a complete deep peroneal nerve injury, which was later shown to be a transection injury. Dr. Yassir testified that cutting the deep peroneal nerve is an option only when a patient's anatomy is so distorted that the surgeon could not tell where structures were or when the tumor was part of the nerve itself. Dr. Yassir theorized that Dr. Klaumann had transected the nerve with an osteotome, which was used as a chisel during the operation. Dr. Yassir pointed out that Dr. Klaumann's operative note looked like Keely's surgery had been a textbook performance of a straightforward operation and did not reflect her concerns that she had voiced to Kim about stretching the nerve.

Dr. Yassir testified that Keely's injury was probably a sharp transection injury but acknowledged that it could have been a retraction injury so severe as to cause essentially a transection. According to Dr. Yassir, the fact that Dr. Nath found a traumatic neuroma on the nerve showed that there was either a transection or a very severe injury.

*Other Defense Evidence*

Dr. Eric Jones, a pediatric orthopedist at West Virginia University, testified that he had been taking care of patients with multiple hereditary osteochondromas for the last 30 years. Dr. Jones estimated that he operated on about 15 to 20 of those patients each year. Dr. Jones' opinion was that Dr. Klaumann complied with the standard of care in this case.

Dr. Jones testified that almost every orthopedist who operates around the peroneal nerve would have a discussion with the patient and family that there might be a peroneal nerve injury following the surgery. Dr. Jones further testified that based on his review of the documentation stating that Dr. Klaumann had discussed the risks and benefits of the surgery with Keely's mother, his assumption was that Dr. Klaumann had talked to her about possible peroneal nerve injury.

According to Dr. Jones, a self-retained retractor, which was used by Dr. Klaumann on Keely, can cause possible injury to a nerve

without the surgeon realizing it at the time of the procedure. Dr. Jones testified that if a nerve is cut, it is much better to fix it immediately because there is a better chance of function returning to the nerve. On the other hand, if a nerve is stretched and intact, there is no reason to go back in surgically until possibly 3 or 4 months later. Dr. Jones' opinion was that the most likely cause for Keely's injury was retraction. Dr. Jones explained why Dr. Nath's findings failed to establish that Keely's injury was a transection injury.

Dr. Jones testified that because there was improvement to Keely's eversion, he certainly would have waited at least 3 or 4 months to see if there was a return of function to the deep peroneal nerve. According to Dr. Jones, as long as some steady improvement is being seen with nerve function, the doctor can continue to monitor it.

Dr. Klaumann testified at trial that surgery is usually the last option for osteochondromas. Unless there is a surgical indication, the osteochondromas are better left alone. According to Dr. Klaumann, because most of osteochondromas are located around nerves and vessels, surgery can cause nerve damage. On the other hand, some osteochondromas will also damage a nerve as they grow in the patient's body.

Dr. Klaumann testified that she discussed surgery with Keely's mother at the March 23, 2005, appointment based on the fact that the amount of pain Keely was having was getting worse over time and that Keely was more tender in certain areas than she had previously been. Contrary to Dr. Yassir's testimony, Dr. Klaumann testified that a CT scan or MRI would not be very helpful in determining whether the osteochondroma was impinging on a nerve. Dr. Klaumann indicated that Kim had also complained to her about a visible cosmetic deformity associated with the fibula osteochondromas and wanted those removed. According to Dr. Klaumann, she discussed the risk of nerve damage to Keely's deep peroneal nerve at the March 23, 2005, visit and also on the morning of the May 2005 surgery. Dr. Klaumann acknowledged that she never used the actual word "permanent" in describing the risk of nerve

damage to Kim. Nevertheless, Klaumann testified that her description of the possible nerve damage conveyed the same idea.

Dr. Klaumann agreed that the injury to Keely's deep peroneal nerve occurred as a result of her May 2005 surgery. Dr. Klaumann testified, however, that during the surgery, she took care to identify the common peroneal nerve and its branches, she carefully retracted the nerve, and she did not see any injury to the deep peroneal nerve during the surgery. Dr. Klaumann admitted that she was concerned about Keely during the postoperative period based on the fact that the surgery was around the nerve.

Dr. Klaumann testified that, in her opinion, her care, evaluation, and treatment of Keely was within the standard of care. Consistent with Dr. Jones' testimony, Dr. Klaumann testified that when a surgeon has identified an intact nerve before the incision is closed but then the nerve is not working during the postoperative period, there is no reason to go back in and explore the nerve.

*Verdict and Posttrial Motion*

After deliberations, the jury rendered a verdict in favor of Dr. Klaumann. The Fosters moved for a new trial, raising a variety of issues, most of which have now been raised in this appeal. The trial court ruled against all of the Fosters' arguments from the bench.

*I. General Physician Standard of Care*

First, the Fosters argue that the trial court erred in instructing the jury on a general physician's duty of care as set forth in PIK Civ. 4th 123.01. The Fosters argued before the trial court that all of the issues in this case related to the specialist duty of care and, therefore, the general physician duty of care should not be placed before the jury. On the other hand, Dr. Klaumann argued that due to the "mixed bag of claims" that the Fosters were making, both the general physician and the specialist duty of care instructions should be given to the jury.

When a party objects to the giving of or failure to give a jury instruction, an appellate court's standard of review is as follows:

"The trial court is required to properly instruct the jury on a party's theory of the case. Errors regarding jury instructions will not demand reversal unless they result in prejudice to the appealing party. Instructions in any particular action are

to be considered together and read as a whole, and where they fairly instruct the jury on the law governing the case, error in an isolated instruction may be disregarded as harmless. If the instructions are substantially correct and the jury could not reasonably have been misled by them, the instructions will be approved on appeal. [Citation omitted.]" *Wood v. Groh*, 269 Kan. 420, 423-24, 7 P.3d 1163 (2000).

Here, over the Fosters' objection, the trial court instructed the jury on both the general physician and the specialist duty of care. The general physician duty of care instruction, which was based on PIK Civ. 4th 123.01, was contained in Instruction No. 6 and provided as follows:

"In performing professional services for a patient, a physician has a duty to use that degree of learning and skill ordinarily possessed and used by members of that profession and of that school of medicine in which the physician practices and under like circumstances. In the application of this skill and learning the physician should also use ordinary care and diligence. A violation of this duty is negligence."

The trial court added the following language to Instruction No. 6 relating to fault: "A party is at fault when he or she is negligent and that negligence caused or contributed to the event which brought about the injury or damages for which claim is made."

The specialist standard of care, which was based on PIK Civ. 4th 123.12, was contained in Instruction No. 7 and provided as follows:

"A surgeon who holds herself out to be a specialist in a particular field of medicine must use her skill and knowledge as a specialist in a manner consistent with the special degree of skill and knowledge ordinarily possessed by other specialists in the same field of expertise at the time of the treatment and diagnosis. A violation of this duty is negligence."

As in Instruction No. 6, the trial court also added the language pertaining to fault in Instruction No. 7.

This case was pled and tried based on Dr. Klaumann holding herself out as a specialist in pediatric orthopedic surgery. It is apparent from the record that there was no contention that Dr. Klaumann should be held to a duty of a general practitioner until Dr. Klaumann's argument, during the instructions conference, that the informed consent and that the course of treatment claims of the Fosters were common to all physicians:

"[The duty for informed consent] is a duty that common malpractice law in Kansas applies to every single physician. Indications for treatment alternatives, that sort of thing are things that all physicians do and all physicians have a duty to do. Where it gets into the specialty is because we're doing a surgery and we acknowledge that surgery is implicated, pediatric orthopedic surgery is implicated, and would be appropriate to give the instruction on the specialist because of that surgery."

In determining that it would give both instructions, the trial court found that the informed consent issue involved a general physician's duty of care and that the courses of treatment issue was "a gray area mixed between both of them."

The Notes on Use to PIK Civ. 4th 123.12 make clear that the specialist duty of care instruction rather than the general duty of care instruction in PIK Civ. 4th 123.01 should be given when a defendant "has held himself or herself out as being a specialist in an area commonly recognized as such in the medical profession." Nevertheless, "[i]f there is a dispute as to which standard is applicable in light of the evidence in the case, both instructions should be given, with the appropriate modifications being made if necessary to avoid confusion for the jury." PIK Civ. 4th 123.12, Notes on Use.

In her appellate brief, Dr. Klaumann maintains that the trial court correctly noted that the Fosters' informed consent claim could be subject to the general physician duty of care instruction. Dr. Klaumann further maintains that under *Douglas v. Lombardino*, 236 Kan. 471, 479-81, 693 P.2d 1138 (1985), the jury could not have been reasonably misled by the giving of both the general and the specialist duty of care instructions because the evidence was undisputed that Dr. Klaumann was a specialist. Nevertheless, Dr. Klaumann's assertion that the jury could not have been reasonably misled by the giving of both a general and a specialist duty of care instructions hinges on whether *Douglas* is analogous to this case.

In *Douglas*, our Supreme Court held that where the evidence is undisputed that the defendant was a specialist, the jury could not have been confused by the giving of both the general physician and the specialist duty of care instructions. 236 Kan. at 479-81. Noting

that the general physician duty of care instruction gave the jury a frame of reference as to the specialist's higher duty of care, our Supreme Court stated:

"In this case, it was clearly established that Dr. Lombardino, as an anesthesiologist, was a specialist. A reading of the record reveals that all 'standard of care' testimony was clearly that of standard of care of a specialist. Since there was no dispute in the evidence that the defendant was a specialist, the jury could not have been confused on this point. The PIK Civ. 2d 15.01 [now PIK Civ. 4th 123.01] instruction gave the jury a frame of reference so they could see that Dr. Lombardino, as a specialist, was being held to a higher degree of care than a general practitioner. If there had been a dispute in the evidence as to whether Dr. Lombardino was a specialist, then the giving of both instructions, without modifications or explanations, might have been confusing. But, in this case, there was no dispute." 236 Kan. at 479-80.

As a result, our Supreme Court found no error in the trial court's decision to instruct the jury on the general physician and the specialist duty of care standards. 236 Kan. at 480.

It is noteworthy that unmentioned in *Douglas* is the case of *Simpson v. Davis*, 219 Kan. 584, 587, 549 P.2d 950 (1976). In *Simpson*, our Supreme Court stated that when a physician undertakes to perform the work of a specialist, the physician will be held to the standard of care applicable to that specialty. 219 Kan. at 587. Because the record clearly showed that Dr. Lombardino was a specialist in *Douglas*, the trial court obviously erred, under the *Simpson* holding, when it also instructed the jury on the general physician duty of care standard. As a result, *Douglas*' rationale for the trial court giving both a specialist and a general physician duty of care instructions—so that the jury "could see that Dr. Lombardino, as a specialist, was being held to a higher degree of care than a general practitioner"—is a subtlety not warranted by the law.

Turning our attention to the facts in *Douglas*, we note that its facts are far different from those in this case. In *Douglas*, all of the testimony presented at trial clearly involved the standard of care of a specialist. Moreover, there is no indication from the *Douglas* opinion that an informed consent claim was ever raised in that case. Here, however, the evidence was confusing as to whether the general physician standard of care or the specialist standard of care should be applied to the Fosters' informed consent claim. Although

the evidence was undisputed that Dr. Klaumann was a specialist in the field of orthopedic surgery, the evidence indicated that informed consent involved areas that were common to all general surgeons. Indeed, the trial court determined that the Fosters' informed consent claim involved a general physician duty of care. In contrast, no such determination was made by the trial court in *Douglas*. The *Douglas* trial court did not determine that a particular claim involved a general physician duty of care.

Arguably in this case, the trial court could have confused the jury in instructing it to measure Dr. Klaumann's duty of care involving the Fosters' claims under both the specialist and the general physician duty of care standards. Moreover, this possible jury confusion should have triggered the trial court's duty to modify the instructions. The trial court should have told the jury which of the Fosters' claims were within the scope of a general physician and which were within the scope of a specialist.

A trial court's duty to modify the general physician and the specialist instructions to avoid confusion for the jury is vividly illustrated by a statement made in *Douglas*. Our Supreme Court stated that when there has been a dispute in evidence as to whether a physician is a specialist, the giving of both the general physician and the specialist instructions, without any modifications or additions, might confuse the jury. 236 Kan. at 480; see also *Short v. Kinkade*, 685 P.2d 210, 212 (Colo. App. 1983) (If there is a dispute as to whether the specialist or general standard of care applies to a given set of facts, the trial court should instruct the jury on both standards of care with proper modifications if necessary to avoid jury confusion.).

Here, despite the trial court's determination that the Fosters' informed consent claim involved a general physician standard of care, the trial court never instructed the jury to limit its consideration of the general physician standard of care to that claim. It has been frequently held that "where instructions are inconsistent and contradictory, involving a material point in the case, their submission to the jury is prejudicial, for the reason that it is impossible to know what effect they may have had on the verdict. [Citations omitted.]" *Atkins v. Clein*, 3 Wash. 2d 168, 171, 100 P.2d 1 (1940).

In this case, the jury was faced with inconsistent standards of care with no instructions on how to apply them to the Fosters' claims. With no instruction limiting its consideration of the general physician standard of care to the informed consent claim, the jury could have applied that standard to one or more of the Fosters' surgical claims, although it was undisputed that Dr. Klaumann was a specialist in pediatric orthopedic surgery. Moreover, any doubt whether the jury could have been confused by the lack of appropriate modifications to the instructions vanishes when we later consider Dr. Klaumann's closing argument.

Because *Douglas* is simply not analogous to this case, the trial court had a duty to modify both the general physician and the specialist instructions to avoid confusion for the jury. The Fosters had five complex claims going to the jury, and it was incumbent upon the trial court to modify the specialist and the general physician duty of care instructions to tell the jury what claims came within the scope of each instruction. As a result, "[t]he trial court's failure to so instruct the jury constitutes prejudicial error." See *Short*, 685 P.2d at 212.

### Dr. Klaumann's Closing Argument

As pointed out previously, based on Dr. Klaumann's closing arguments, the jury could have been further misled into believing that the general physician standard of care was actually the standard to be applied to one or more of the Fosters' surgical claims, although it was undisputed that Dr. Klaumann was a specialist in pediatric orthopedic surgery. Specifically, during closing argument, defense counsel focused the jury on the general physician duty of care as contained in Instruction No. 6 as follows:

"Instruction No. 6 is the general instruction on what the duty of care is for a physician. And I want to go over that very briefly with you. In performing professional services for a patient a physician has a duty to use that degree of learning and skill ordinarily possessed and used by members of that profession and of that school of medicine in which the physician practices and under like circumstances. And in the application of this skill and learning, the physician should also use ordinary care and diligence.

"I emphasize this instruction to the extent that there's any confusion about what the duty is. It's not a duty of extraordinary care. A doctor is not held to the same

level as somebody who is at the best or highest practicing institution in the country. It is what the doctor next door who practices pediatric orthopedic medicine all over the country, in all communities, whether they're small communities or large institutions like some of our experts are from, it is a standard of using ordinary care. *The same type of care that reasonable physicians no matter where they are would use under the same or similar circumstances*. It's just our way of pointing out that it's not an extraordinary standard. It's not a gold standard. It is what reasonable physicians would do under the same or similar circumstances." (Emphasis added.)

After this in-depth discussion of Instruction No. 6 (general physician duty of care), defense counsel did not even reference Instruction No. 7 (specialist duty of care) but instead proceeded to talk about Instruction Nos. 8, 9, and 10.

During his discussion of Instruction No. 8, which is contained in PIK Civ. 4th 123.10 and relates to a health care provider's standard of care as established through expert testimony, defense counsel indicated to the jury that it was to apply a general physician duty of care:

"The standard of care *is what reasonable physicians* are doing all across the country. And it's developed more by experience and training than anything that comes off—that comes off a book. And there are different ways of approaching the problems. And those are approaches. As long as *other physicians* would do the same thing, there isn't just one single approach to the problem." (Emphasis added.)

During the rest of closing argument, defense counsel failed to mention the higher specialist duty of care that the jury was to apply to the Fosters' claims.

When all is considered, based on the trial court instructing the jury to measure Dr. Klaumann's duty of care as both a specialist and a general physician, without instructing the jury on which of the Fosters' claims were within the scope of a general physician and which were within the scope of a specialist, and based on Dr. Klaumann's closing argument, it may be seriously doubted whether the jury properly determined which of the Fosters' claims were within the scope of a specialist and which were within the scope of a general physician based on the instructions given by the trial court.

*Dr. Klaumann Should Have Been Held to the Specialist Standard of Care*

As we stated earlier, it was error based on the *Simpson* holding for the trial court to give the general physician duty of care instruction in *Douglas* when the record showed that the defendant doctor was a specialist. Here, despite the evidence that informed consent involved areas common to all surgeons, the undisputed evidence presented throughout the trial was that Dr. Klaumann was a specialist in the field of pediatric orthopedic surgery. The law in Kansas is that a doctor who holds himself or herself out to be a specialist in the medical field should be held to the higher standard of care and skill required of a specialist. Our Supreme Court has held:

"It is the generally accepted rule that a physician or surgeon or dentist who holds himself out to be a specialist is bound to bring to the discharge of his professional duties as a specialist that degree of skill, care and learning ordinarily possessed by specialists of a similar class, having regard to the existing state of knowledge in medicine, surgery and dentistry, that is, a higher degree of skill, care and learning than that of the average practitioner. [Citations omitted.]" *Simpson*, 219 Kan. at 587.

See *Rule v. Cheeseman, Executrix*, 181 Kan. 957, 965, 317 P.2d 472 (1957); 61 Am. Jur. 2d Physicians, Surgeons, and Other Healers § 209, p. 315 (2002); 70 C.J.S. Physicians and Surgeons § 85, pp. 560-62 (2005).

Similarly,

"[a]n actor undertaking to render services may represent that he has superior skill or knowledge, beyond that common to his profession or trade. In that event he incurs an obligation to the person to whom he makes such a representation, to have, and to exercise, the skill and knowledge which he represents himself to have. Thus a physician who holds himself out as a specialist in certain types of practice is required to have the skill and knowledge common to other specialists." Restatement (Second) of Torts § 299A, Comment d, p. 74 (1964).

See also Prosser, Torts § 32, pp. 161-63 (4th ed. 1971) (If a professional represents himself or herself as having greater skills than the average member of the profession, the applicable standard of care is modified accordingly.).

Here, the evidence presented throughout the trial was undisputed that Dr. Klaumann had held herself out to be a specialist in

the field of pediatric orthopedic surgery and that the Fosters had accepted Keely's treatment with that understanding. Kim had actively sought out Dr. Klaumann for her expertise in dealing with Keely's hereditary condition.

In arguing before the trial court, Dr. Klaumann cited no authority as to why the general physician standard of care would apply when it was undisputed that Dr. Klaumann was a specialist. Dr. Klaumann's attorney did assert to the trial court that both the general physician and the specialist instructions were typically given in all of the medical malpractice cases he tried. While this might be what defense counsel has grown accustomed to, this is clearly not the law in Kansas. The general physician and the specialist instructions should both be given *when there is a dispute as to which standard of care applies*. PIK Civ. 4th 123.12, Notes on Use.

Although there was evidence offered at trial indicating that informed consent involved areas that were common to all surgeons, there was also testimony that this particular surgery involved peculiar risks that needed to be communicated to Keely and her family. Expert testimony established that informed consent would include telling the patient that there could be a peroneal nerve injury following surgery. Because Dr. Klaumann had held herself out as a specialist in the field of pediatric orthopedic surgery, she would be held to the higher standard of care in informing Keely and her family of the known risks of her surgery. As a specialist, the duty to inform would include informing Keely of the risks of that particular surgery, along with the other risks of surgery. Under the rule enunciated in *Simpson*, the jury should have been instructed that the specialist duty of care applied to the Fosters' claims in this case. See *Morrison v. McKillop*, 17 Wash. App. 396, 400, 563 P.2d 220 (1977), *rev. denied* 90 Wash. 2d 1002 (1978) (A specialist is held to a specialist standard of care regarding the duty to inform.). As a result, the general physician duty of care was inapplicable to the Fosters' claims in this case.

In short, Dr. Klaumann held herself out to be a specialist in the field of pediatric orthopedic surgery, and Keely and her parents accepted the treatment with that understanding. Because all of the Fosters' claims relate to the discharge of Dr. Klaumann's profes-

sional duties as a pediatric orthopedic surgeon in her care and treatment of Keely, Dr. Klaumann should have been held to the standard and skill of a specialist in pediatric orthopedic surgery on all of the Fosters' claims. As stated earlier, abundant precedent affords a sound basis for this conclusion.

## II. "Best Judgment" Jury Instruction

Next, the Fosters assert that the trial court erred in giving the jury the "best judgment" instruction as contained in PIK Civ. 4th 123.11.

When a party objects to the giving of or failure to give a jury instruction, this court's standard of review is as follows:

"The trial court is required to properly instruct the jury on a party's theory of the case. Errors regarding jury instructions will not demand reversal unless they result in prejudice to the appealing party. Instructions in any particular action are to be considered together and read as a whole, and where they fairly instruct the jury on the law governing the case, error in an isolated instruction may be disregarded as harmless. If the instructions are substantially correct and the jury could not reasonably have been misled by them, the instructions will be approved on appeal. [Citation omitted.]" *Wood v. Groh*, 269 Kan. 420, 423-24, 7 P.3d 1163 (2000).

Over the Fosters' objection, the trial court gave the jury the following best judgment Instruction No. 9, which was based on PIK Civ. 4th 123.11:

"Where, under the usual practice of the profession of the defendant, Michelle Klaumann, M.D. different courses of treatment are available which might reasonably be used, the orthopedic surgeon has a right to use her best judgment in the selection of the choice of treatment.

"However, the selection must be consistent with the skill and care which other orthopedic surgeons practicing in the same field of expertise would use in similar circumstances."

The Notes on Use for PIK Civ. 4th 123.11 state that "[w]here there is a dispute as to which of two or more courses is to be pursued in administering treatment, this instruction should be used."

The best judgment language incorporated in PIK Civ. 4th 123.11 appears to have its roots in two earlier cases from our Supreme Court. See *Natanson v. Kline*, 186 Kan. 393, 399, 350 P.2d 1093, *clarified and reh. denied* 187 Kan. 186, 354 P.2d 670 (1960); *Go-*

*heen v. Graber*, 181 Kan. 107, 112, 309 P.2d 636 (1957). Our Supreme Court in *Goheen* held that when there is doubt as to which of two or more courses is to be pursued, a physician is bound to use his or her best judgment. 181 Kan. at 112. Later, in *Natanson*, our Supreme Court approved a jury instruction containing best judgment language as a correct statement of the law. The jury instruction provided in part as follows: " 'And if among radiologists more than one method of treatment is recognized, it would not be negligence for the physician to have adopted such any of such methods if the method he did adopt was a recognized and approved method at the time and place of treatment.' " 186 Kan. at 399.

After the best judgment language was incorporated into a PIK instruction, this court approved the use of the instruction in *Hibbert v. Ransdell*, 29 Kan. App. 2d 328, 26 P.3d 721, *rev. denied* 272 Kan. 1418 (2001). This court pointed out that the best judgment PIK instruction does not permit a jury to absolve a defendant who uses his or her best judgment when that judgment is not consistent with the special degree of skill and knowledge possessed by other specialists in the field. This court found that PIK Civ. 3d 123.11 (now PIK Civ. 4th 123.11) accurately stated the law in Kansas, especially since it was given with PIK Civ. 3d 123.12 (now PIK Civ. 4th 123.12), which states the objective standard of care of a specialist. 29 Kan. App. 2d at 332-34.

In approving the use of PIK Civ. 3d 123.12 in *Hibbert*, this court pointed out that our Supreme Court seems to have accepted the best judgment language as a proper statement of the physician's duties in *Smith v. Welch*, 265 Kan. 868, 881-82, 967 P.2d 727 (1998). *Hibbert*, 29 Kan. App. 2d at 334. Although *Smith* did not involve a jury instruction issue, our Supreme Court held that a physician has an obligation to a patient "to use reasonable and ordinary care and diligence in the treatment of cases the physician undertakes, *to use his or her best judgment,* and to exercise that reasonable degree of learning, skill, and experience which is ordinarily possessed by other physicians. [Citations omitted.]" (Emphasis added.) 265 Kan. at 881.

The Fosters contend that the giving of the best judgment PIK instruction in this case was contrary to the rule in *Wecker v. Amend,*

22 Kan. App. 2d 498, 918 P.2d 658, *rev. denied* 260 Kan. 1002 (1996). The Fosters maintain that under *Wecker*, the best judgment instruction applies "where there are alternative courses of treatment which are *considered* and *discussed* with the patient."

Nevertheless, *Wecker* did not hold that the best judgment instruction applies when alternative courses of treatment are considered and discussed with the patient. In determining that the best judgment instruction should not have been given under the facts in that case, this court in *Wecker* stated:

> "*The real problem with the instruction is that the facts of this case do not put into issue the question whether Amend [the defendant physician] properly selected between two or more courses of treatment.* The evidence was that only one treatment—the laser surgery—was ever suggested to Wecker [the patient]. The real issue, therefore, is whether Wecker was properly informed of her options sufficient to allow her to give an informed consent to a course of treatment." (Emphasis added.) 22 Kan. App. 2d at 504.

The first sentence of the quoted paragraph shows that the court disapproved the giving of the best judgment instruction in that case because the evidence failed to show that the physician properly selected between two or more courses of treatment. Although this court did note that only one treatment had been suggested to the patient, it is apparent that this was a comment on the evidence and a shift in the court's focus to the real issue of informed consent. As a result, *Wecker* does not stand for the holding urged by the Fosters.

It should be pointed out that nowhere in *Hibbert* does this court recognize that the best judgment instruction should be given only in those cases where alternative courses of treatment were not only considered by the physician but also discussed with the patient. Moreover, our Supreme Court in *Natanson* and *Goheen* did not indicate that a physician's best judgment came into play only when the alternative courses of treatment had been discussed with the plaintiff. While the issue of whether alternative courses of treatment have been adequately discussed with the patient certainly bears on whether the patient has given informed consent to the procedure, it does not limit the giving of the best judgment instruction. Contrary to the Fosters' argument, there is no authority for

limiting the best judgment instruction to those cases where alternative courses of treatment have been discussed with the patient.

Despite approval of the best judgment jury instruction by this court, the Fosters suggest that this court should follow other jurisdictions that have disapproved the best judgment rule and reject PIK Civ. 4th 123.11 outright.

Importantly, *Hibbert* considered the fact that many jurisdictions have rejected the best judgment language when used in statutes and rules in defining the standard of care in medical malpractice actions. Nevertheless, this court pointed out that there are other jurisdictions that have approved the best judgment language. See *Sisson by and through Allen v. Elkins*, 801 P.2d 722, 727 (Okla. 1990); *Fragale v. Brigham*, 741 A.2d 788, 790-91 (Pa. Super. 1999), *appeal denied* 563 Pa. 629, 758 A.2d 662 (2000). This court concluded that the law in Kansas allows a trial court to give the best judgment PIK instruction, particularly when it is given with the objective standard of care PIK instruction. *Hibbert*, 29 Kan. App. 2d at 332-34; see PIK Civ. 4th 123.11; PIK Civ. 4th 123.12.

Our research has revealed a growing number of other jurisdictions that have eliminated the use of a best judgment jury instruction because of the concern of jury confusion. In O'Connell & Boutros, *Treating Medical Malpractice Claims Under a Variant of the Business Judgment Rule*, 77 Notre Dame L. Rev. 373, p. 383 n.49 (February 2002), it has been recognized that the use of the best judgment standard in medical malpractice cases can be seen as creating jury confusion:

"The best judgment rule is seen as creating tension in determining malpractice and leaves room for confusion in the formulation of jury instruction. [Citation omitted.] For instance, it is argued that it is possible for physicians to exercise their best judgment yet still decide on a course of treatment that would not have been chosen by competent members of the physician's medical community (whether based on a 'similar community' or 'national community' standard). [Citation omitted.] Under such a situation, it is argued physicians' use of their best judgment is not—nor should it be misunderstood by a trier of fact to be—a sufficient defense against evidence of incompetence. [Citation omitted.] Because of the concern of jury confusion, courts have shifted toward eliminating the best judgment (or 'error of judgment') standard. [Arkes & Schipani, *Medical Malpractice v. the Business Judgment Rule: Differences in Hindsight Bias*, 73 Or. L. Rev.

587, 602 n.62 (1994)] (citing Shumaker v. Johnson, 571 So. 2d 991, 994 (Ala. 1990); Ouellette v. Subak, 391 N.W.2d 810, 815 [Minn. 1986]; Shamburger v. Behrens, 380 N.W.2d 659, 663 (S.D. 1986); Wall v. Stout, 311 S.E.2d 571, 577 (N.C. 1984); Teh Len Chue v. Fairfax Emergency Med. Ass'n, 290 S.E.2d 820, 822 (Va. 1982))."

In numerous cases from other jurisdictions, courts have determined that a best judgment jury instruction can confuse the jury by injecting a subjective standard into a medical malpractice case where the jury should be focused on applying an objective standard of care. For example, in *Hirahara v. Tanaka*, 87 Hawaii 460, 464-65, 959 P.2d 830 (1998), the court held that a jury instruction, which used the term "best judgment," could improperly lead the jury to view a physician's behavior from a subjective standard and should be avoided in future cases. The court explained as follows:

"In Hawai'i, 'it is well settled that in medical malpractice actions, the question of negligence must be decided by reference to relevant medical standards of care[.]' [Citation omitted.] The relevant standard of care is an objective one. The jury's analysis of a defendant physician's actions must be confined to a determination of whether his actions fell below this standard. Informing the jury that a physician is not negligent for utilizing his or her best judgment to choose among acceptable alternatives is unnecessary. The jury must focus on whether the physician breached the standard of care. His or her exercise of 'best judgment' is superfluous to the determination." 87 Hawaii at 465.

Similarly, in *Bickham v. Grant*, 861 So. 2d 299, 302-03 (Miss. 2003), the court held that best judgment jury instructions are misstatements of law because they hold the physician to his or her own personal standard of care and not that which is applicable to the physician in his or her area of practice.

"[A] subjective jury instruction in a medical malpractice case is a misstatement of law, and as stated earlier a defendant is generally entitled to an instruction that presents his side of the case, if such instruction is a correct statement of the law. [Citation omitted.] The appropriate standard of care in a medical malpractice case is objective and centers around exercising the degree of care, diligence, and skill ordinarily possessed and exercised by a minimally competent and reasonably diligent, skillful, care, and prudent physician in that field of practice. What the physician may have been thinking in 'his best judgment' is irrelevant. What the physician did in treating the patient is the key factor. Patients expect their physician to always be exercising 'their best judgment.' However, it is clear that there are times where the physician's best judgment regarding treatment falls below the

applicable standard of care. This is why instructions such as C-20 are misstatements of law as they hold the physician to his own personal standard of care and not the standard of care applicable to physicians in his area of practice." 861 So. 2d at 303.

In *Parodi v. Washoe Medical Ctr.*, 111 Nev. 365, 370-71, 892 P.2d 588 (1995), the court rejected "error-in-judgment" and "best judgment" jury instructions because such instructions may confuse jurors into focusing on a health care provider's subjective intentions and judgments rather than on the real issue of whether the health care provider's conduct conformed to an objective standard of care.

In *DiFranco v. Klein*, 657 A.2d 145, 148-49 (R.I. 1995), the court held that phrases like "good faith", "good faith judgment," "honest mistake," and "honest error in judgment" tend to create confusion among jurors by erroneously implying that only dishonest or bad-faith deviations from the applicable standard of care constitute actionable negligence. See *Rooney v. Medical Center Hospital of Vt., Inc.*, 162 Vt. 513, 519-20, 649 A.2d 756 (1994); King, Jr., *Reconciling the Exercise of Judgment and the Objective Standard of Care in Medical Malpractice*, 52 Oklahoma L. Rev. 49, 75 (Spring 1999) (" 'best judgment' " language in jury instruction may "mislead the jury into incorrectly believing that subjective notions inherent in the exercise of one's best judgment supplant the objective standard of care").

Importantly, neither this court nor our Supreme Court has expressed outright disapproval of the giving of a best judgment jury instruction. Moreover, it appears that the drafters of PIK Civ. 4th 123.11 have attempted to relate the best judgment instruction back to the appropriate standard of care by including the following sentence at the end of the best judgment instruction: "However, the selection must be consistent with the skill and care which other *(physicians practicing in the same field in the same or similar community) (specialists practicing in the same field of expertise)* would use in similar circumstances." Although this sentence refers to the objective standard of care, we believe that the application of the entire instruction could be confusing to jurors in certain cases. When jurors are confronted with complex factual issues that must be decided before reaching the ultimate determination of whether

a physician breached the standard of care, the best judgment language in the instruction could potentially mislead jurors into improperly considering the physician's subjective intent or belief.

Recently, this court in *Lee v. Fischer*, 41 Kan. App. 2d 236, 202 P.3d 57 (2009), affirmed the trial court's refusal to give the best judgment instruction in a medical malpractice case. This court determined that the best judgment instruction need not be given when factual issues must be resolved before it can be said that there were truly different courses of treatment available to the health care provider. 41 Kan. App. 2d 236, Syl. ¶ 5. There, the appellant argued that the trial court erred in refusing to give the jury a requested best judgment jury instruction based on PIK Civ. 3d 123.11. Recognizing that there was no Kansas case holding that the failure to include the best judgment instruction is reversible error, this court stated:

"Our appellate courts have approved the use of this instruction, but we have never concluded that the failure to include the instruction is reversible error. See, e.g., *Hibbert v. Ransdell*, 29 Kan. App. 2d 328, 334, 26 P.3d 721, *rev. denied* 272 Kan. 1418 (2001). As is apparent from the second paragraph of the requested instruction, the selection or choice of treatment must be consistent with the applicable standard of care; we view the instruction as having little if any determinative impact on a jury's view of the evidence because the ultimate determination remains a question of deviation from the standard of care. Our court has recently examined the history of the instruction and criticized the principal authority from which it is derived. See *LaShure v. Felts*, 40 Kan. App. 2d 1001, 197 P.3d 885 (2008)." *Lee*, 41 Kan. App. 2d at 245-46.

This court determined that based on the testimony in that particular case, there was really only one scenario that presented a true choice of treatment situation, which would have required the jury to do some fact finding on the true circumstances at the moment of decision. 41 Kan. App. 2d at 247. This court noted that depending on how the jury resolved the factual issues, there may or may not have been a true "best judgment" situation to make PIK Civ. 3d 123.11 applicable. This court concluded that the giving of the best judgment instruction in that case could have been as confusing as it could have been helpful. As a result, this court held that the trial court did not err in refusing to give the best judgment instruction. 41 Kan. App. 2d at 247-48.

In the present case, the jury was presented with numerous complex factual issues that it had to resolve in order to determine whether Klaumann had complied with the standard of care.

For example, as to the Fosters' claim that Klaumann had failed to properly and timely treat Keely's nerve injury, the jury had to decide complex factual questions before it could determine whether there were truly different courses of treatment within the applicable standard of care. Based on the testimony admitted at trial, the decision to monitor Keely *immediately* after the surgery versus a decision to go back in to assess the damage to the peroneal nerve were true choices of treatment only if the jury found that Klaumann had not transected the peroneal nerve during the surgery or had not severely stretched the nerve to the point where there had been a complete transection during the surgery. Further, a decision to continue monitoring Keely at 3 months after the surgery versus a decision to surgically assess and repair the damage to the nerve were true choices of treatment only if the jury found that there had continued to be a return of function to Keely's nerve.

Moreover, as to the Fosters' claim that Klaumann had surgically removed the osteochondromas without proper indication, the expert testimony at trial indicated that Klaumann was faced with the following three treatment options: (1) surgically remove the osteochondroma; (2) conduct further testing to determine if the osteochondroma was impinging on the peroneal nerve; or (3) continue monitoring the osteochondroma with x-rays and physical examinations. In order for the jury to determine that the decision to surgically remove the osteochondroma was within the standard of care, the jury first needed to find that there were proper indications relating to that particular osteochondroma to perform the surgery.

Thus, the jury was faced with resolving those complex factual issues before it could even determine whether there was a true choice of treatment situation and whether Klaumann had acted within the appropriate standard of care by choosing a particular treatment. Under those circumstances, the best judgment jury instruction could have been as confusing to the jury as it was helpful. The best judgment language could have improperly focused the jury on Klaumann's subjective judgment in determining which

treatment to pursue with Keely. Instead, the jury on this case should have been forced to deal with the objective facts and not have been confused by any suggestion that Klaumann's own personal standard of care was relevant to its ultimate determination in this case. By including the best judgment language in the jury instructions, the jury could have easily gotten off track in deciding whether Klaumann's decisions complied with the standard of care. Under the particular facts of this case, we determine that the best judgment jury instruction could have reasonably misled the jury, and it should not have been given at trial.

Based on the error that occurred in instructing the jury on the general physician duty of care and the best judgment instruction, we reverse the jury's verdict and remand the case for a new trial.

Our decision to reverse and remand for a new trial makes it unnecessary to address the rest of the issues raised by the Fosters. Nevertheless, to provide guidance, we will address the issues that could arise again at the new trial. See *State v. Scott*, 286 Kan. 54, 107, 183 P.3d 801 (2008).

### III. Admission of Expert Testimony

Next, the Fosters argue that the trial court erred in admitting Dr. Mackinnon's expert testimony beyond her care and treatment of Keely.

When reviewing a trial court's decision to admit evidence, an appellate court first determines whether the evidence is relevant. Relevant evidence is "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). Thus, the evidence to be relevant also must be material. *State v. Reid*, 286 Kan. 494, 505, 186 P.3d 713 (2008). The standard of review of whether evidence is material is de novo. *Reid*, 286 Kan. at 505. The standard of review of whether the evidence is probative in the particular cases is reviewed under the abuse of discretion standard. *Reid*, 286 Kan. at 507-08. Finally, even if evidence is material and probative, the trial court must determine whether the evidence is unduly prejudicial. The appellate court reviews the determination whether evidence is unduly prejudicial under the abuse of discretion standard. *Reid*, 286 Kan. at 512.

Here, there is no dispute that Dr. Mackinnon's testimony was relevant to the issues before the jury in this medical malpractice action. Moreover, there is no question regarding Dr. Mackinnon's qualifications, the relevancy of her opinion, or her ability to assist the jury in understanding technical facts or material evidence. See K.S.A. 60-456 (b), (d).

Instead, the issues are whether the trial court should have excluded Dr. Mackinnon's expert testimony for the following reasons: (1) that as Keely's treating physician, Dr. Mackinnon should not have been allowed to testify beyond care and treatment; and (2) that Dr. Mackinnon should not have been allowed to express opinions not properly disclosed during discovery.

To the extent that those issues involve interpretation of K.S.A. 60-226 and K.S.A. 60-427, this court applies an unlimited standard of review. See *Genesis Health Club, Inc. v. Wichita*, 285 Kan. 1021, 1031, 181 P.3d 549 (2008).

Nevertheless, the ultimate decision of the trial court to admit Dr. Mackinnon's expert testimony is reviewed for abuse of discretion. "Generally, the admission of expert testimony lies within the sound discretion of the trial court, and its decision will not be overturned absent an abuse of such discretion. [Citations omitted.]" *State v. Johnson*, 286 Kan. 824, 831, 190 P.3d 207 (2008).

### A. Ex Parte Interview of Plaintiffs' Treating Physician

This court has received two *amicus curiae* briefs, one from the Kansas Association for Justice and the other from the Kansas Association of Defense Counsel, on the issue of whether defendants in a medical malpractice case should be allowed under Kansas law to conduct ex parte interviews of a plaintiff's treating physician.

The Kansas Association for Justice argues that the only way to support "the confidentiality and fiduciary obligations inherent in the physician-patient relationship" would be to require that access to the treating physician be made by one of the methods set forth in K.S.A. 60-226(a) (which does not include ex parte interviews) or to allow plaintiffs to be present during defendants' interviews of the plaintiffs' treating physician. On the other hand, the Kansas Association of Defense Counsel argues that ex parte interviews

between a party's counsel and a personal injury plaintiff's treating physician are a proper, valuable means of discovery.

The present case, however, is not in the proper posture to address the *amici*'s arguments. That is because the Fosters expressly agreed to allow defense counsel to privately speak with Keely's treating physicians and explicitly waived any objections that they had to this procedure. In the "Agreed Order for Inspection and Reproduction of Medical, Employment and Protected Health Information Pursuant to State and Federal Law (HIPAA) and Notification of Waiver of Physician-Patient Privilege," both the Fosters and Dr. Klaumann agreed as follows:

"Pursuant to state law and the rules of the Eighteenth Judicial District, counsel for the parties are hereby authorized to talk with Plaintiff's treating physicians or other health care providers without opposing counsel or the parties, including the Plaintiff, being present or participating, provided the health care provider consents to the interview. This is based on the Court's finding that the Plaintiff has made a claim for personal injuries, and in filing this lawsuit has, pursuant to Kansas law, waived any privilege existing between the patient and health care provider as defined in K.S.A. 60-427. By virtue of filing this action, the Plaintiff is aware that this Order has been entered, *has been given the opportunity to object, and has waived any objection through counsel.*" (Emphasis added.)

Both the Fosters' and Dr. Klaumann's attorneys approved and signed this agreed order.

Whether ex parte interviews are a proper method of discovery in medical malpractice cases raises an interesting question, but the argument is not properly before the court in this case. Here, the Fosters never argued to the trial court that the ex parte interviews were improper. See *Miller v. Bartle*, 283 Kan. 108, 119, 150 P.3d 1282 (2007) (Issues not raised before the trial court cannot be raised on appeal.). In fact, at the later motion in limine hearing, the Fosters' attorney conceded that he had signed the agreed order. Because the Fosters agreed to defense counsel's ex parte contact with Keely's treating physicians and explicitly waived any objections to this contact, the *amici*'s arguments are not properly before this court.

## B. Dr. Mackinnon's Testimony

The Fosters next argue that the trial court should not have allowed Dr. Mackinnon to testify beyond care and treatment. Although the Fosters have framed this issue differently than the *amici curiae* framed this issue, most of the Fosters' argument in their appellate brief still attacks the propriety of defense counsel's ex parte interviews with plaintiffs' treating physicians.

Specifically, the Fosters argue that there is nothing in K.S.A. 60-427, which relates to waiver of the physician-patient privilege, allowing solicitation and recruitment of a plaintiffs' treating physician to testify on standard of care and causation for the defense, nor is there any mention of private interviews with treating physicians. The Fosters specifically take issue with Rule 208 of the 18th Judicial District that permits lawyers in a medical malpractice case to have private interviews with treating physicians. The Fosters maintain that Rule 208 creates a method of discovery not contemplated by the legislature and allows defense attorneys to induce a treating physician to become a retained expert.

To support their argument on this issue, the Fosters quote language from the Interprofessional Code of Responsibility § 6.03 (a document endorsed by the Colorado Bar Association and the Colorado Medical Society), which is cited in the Colorado case of *Samms v. Dist. Court, Fourth Jud. Dist.*, 908 P.2d 520, 527-28 (1995), as follows:

> "A treating physician should not discuss the case privately with a patient's adversaries without a clear and expressed authorization to do so or without knowledge by the patient's attorney of the time and place with an opportunity to object or be present at that meeting . . . ."

The Fosters' argument is disingenuous when they, through their attorney, specifically agreed to the ex parte interviews, did not place any limitations on the interviews, and explicitly waived any objections to the interviews. By their actions in signing off on the agreed order, the Fosters have invited any error that occurred. See *Dees v. Marion-Florence U.S.D. No. 408*, 36 Kan. App. 2d 768, 782, 149 P.3d 1 (2006) (" 'A party may not invite error and then complain of that error on appeal.' "). Moreover, although the Fos-

ters later argued to the trial court that Dr. Mackinnon should not be allowed to testify beyond her care and treatment of Keely, the Fosters never attempted to rectify the situation by objecting to the ex parte interviews or asking that limitations be placed on the interviews before defense counsel met with Keely's treating physicians.

Once Dr. Klaumann's attorney spoke privately with Dr. Mackinnon and found out relevant, discoverable information, it was too late for the Fosters to argue that this information should not have been discovered. Their attempts to keep out the information should have been before the relevant information was discovered.

If the Fosters have been caught in a "Catch-22" situation, it is a situation that they made for themselves. They, through their attorney, consented to the ex parte contact with Keely's treating physician by signing off on the agreed order and explicitly waiving any objection. Once the Fosters learned about Dr. Mackinnon's expert opinion, there was no way to remedy the situation. Dr. Klaumann had already discovered Dr. Mackinnon's relevant, expert opinion in the case, and the expert disclosures were timely made. Under those circumstances, the trial court did not abuse its discretion in admitting Dr. Mackinnon's testimony beyond care and treatment.

## C. Expert Opinion Disclosure

The Fosters further argue that the trial court erred in allowing Dr. Mackinnon to express opinions not disclosed in accordance with the court's scheduling order, the requirements of K.S.A. 60-226(b), and the duty to supplement as set forth in K.S.A. 60-226(e)(1) and (2).

The control of discovery is entrusted to the trial court's sound discretion, and orders concerning discovery will not be disturbed on appeal absent an abuse of that discretion. Discretion is abused when no reasonable person would take the view of the trial court. *Fusaro v. First Family Mtg. Corp.*, 257 Kan. 794, 808, 897 P.2d 123 (1995).

Under K.S.A. 60-226(b)(6), a party is required to disclose the identity of an expert witness, the subject matter of the expert's testimony, the substance of the facts and opinions expected to be

testified to by the expert, and the grounds for each opinion during discovery:

"(A) A party shall disclose to other parties the identity of any person who may be used at trial to present expert testimony.

"(B) Except as otherwise stipulated or directed by the court, this disclosure with respect to a witness (i) whose sole connection with the case is that the witness is retained or specially employed to provide expert testimony in the case or (ii) whose duties as an employee of the party regularly involve giving expert testimony, shall state the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion."

These expert disclosures "shall be made at the times and in the sequence directed by the court" K.S.A. 60-226(b)(6)(C). Unless otherwise ordered by the court, expert disclosures "shall be made in writing, signed and served. Such disclosures shall be filed with the court in accordance with subsection (d) of K.S.A. 60-205, and amendments thereto." K.S.A. 60-226(b)(6)(D).

A party who has made a disclosure or responded to a request for discovery under K.S.A. 60-226(b)(6) "is under a duty to supplement or correct the party's disclosure or response to include information thereafter acquired if ordered by the court" or under the following circumstances:

"(1) A party is under a duty to supplement at appropriate intervals its disclosures under subsection (b)(6) if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. *With respect to testimony of an expert under subsection (b)(6) the duty extends both to information contained in the disclosure and to information provided through a deposition of the expert, and any additions or other changes to this information shall be disclosed at least 30 days before trial, unless otherwise directed by the court.*" (Emphasis added.) K.S.A. 60-226(e)(1).

Here, the trial court's amended scheduling order required Dr. Klaumann to file K.S.A. 60-226 disclosures for all her expert witnesses by May 7, 2007. In addition, the scheduling order provided for supplemental expert disclosures as follows:

"Supplemental expert disclosures may be made. If done within ten days after the initial disclosure, the supplemental disclosure may cure an otherwise defective initial disclosure. Except for good cause shown, all supplemental disclosures must

be made at least seven days prior to the scheduled deposition of the expert in question."

On May 7, 2007, Dr. Klaumann disclosed Dr. Mackinnon as a defense expert witness. In her May 7, 2007, expert disclosures, Dr. Klaumann also provided the following information relating to Dr. Mackinnon:

"Dr. Mackinnon was one of Plaintiff's consulting/treating physicians and saw Plaintiff on or about July 28, 2006. Based upon the information available to Dr. Mackinnon, she is of the opinion that Dr. Klaumann did not deviate from the applicable standard of care in treating Plaintiff. Dr. Mackinnon is of the opinion that the type of deficit sustained by the Plaintiff is a known risk and complication of the type of surgery performed, and that the deficit experienced by the Plaintiff is also a known risk of not having the surgery and allowing osteochondromas to continue to grow and impinge on the peroneal nerve and/or its branches. It is further Dr. Mackinnon's opinion that the Plaintiff received corrective treatment well within the known and accepted surgical 'window' and indeed would not have been critical had Dr. Nath waited an additional amount of time to perform the surgery. Perhaps initially performing a nerve release followed later by a nerve graft procedure.

"Dr. Mackinnon will also offer testimony based upon her evaluation of the patient and medical records. Dr. Mackinnon reserves the right to supplement her opinions based upon additional information which may be reviewed and which may become known during the course of discovery. Dr. Mackinnon charges $1,500 per hour for deposition. Defendant has requested a copy of Dr. Mackinnon's curriculum vitae and dates for her deposition and will produce as soon as received from Dr. Mackinnon."

Following that disclosure, the Fosters served notice to take the deposition of Dr. Mackinnon. Her deposition was scheduled for July 27, 2007. The attorney for the Fosters sent a letter to Dr. Mackinnon advising her that although Keely had no objection to her testifying about her care and treatment, Keely did not consent to testimony involving issues of causation and Dr. Klaumann's standard of care. Dr. Mackinnon's attorney responded by stating that Dr. Mackinnon had agreed to give testimony regarding the care and treatment provided to Keely. Dr. Mackinnon's attorney stated that, if asked, Dr. Mackinnon would answer other questions within her area of expertise, including matters involving standard of care.

In a July 10, 2007, letter, the Fosters' attorney notified Dr. Klaumann's attorney that the Fosters were canceling Dr. Mackinnon's

deposition. The Fosters' attorney stated that they had been informed by Dr. Mackinnon's staff that when the expert disclosure was filed, Dr. Mackinnon was unaware of her designation as a retained expert and had not reviewed any information outside of her involvement with Keely. The Fosters' attorney further stated that Keely objected to any attempt to present Dr. Mackinnon as an expert on any issues outside of Keely's care and treatment. Finally, the Fosters' attorney stated that "[i]nasmuch as Dr. Mackinnon's medical records will be admitted in this matter, which adequately cover her care, treatment and prognosis opinions, we do not have a need to take her deposition and are hereby cancelling it."

That same day, Dr. Klaumann's attorney wrote the Fosters' attorney that the cancellation of Dr. Mackinnon's deposition was "at your own risk." Dr. Klaumann's attorney stated that he had confirmed with Dr. Mackinnon that she was planning to give testimony regarding her evaluation of Keely and matters within her area of expertise, "including questions regarding the standard of care and consistent with our expert witness disclosure." Dr. Klaumann's attorney further stated that while he had designated Dr. Mackinnon as a defense expert, she was not a " 'specially retained' " expert, that is, one " 'whose sole connection with the case is that the witness is retained or specially employed to provide expert testimony in the case.' "

Trial was scheduled for October 9, 2007. On September 5, 2007, the Fosters moved for an order in limine to restrict Dr. Mackinnon's testimony to Keely's care and treatment. On September 7, 2007, Dr. Klaumann served supplemental expert disclosures pertaining to Dr. Mackinnon on the Fosters' attorney. In this supplemental expert disclosure, Dr. Klaumann provided the following additional information relating to Dr. Mackinnon's testimony:

"Dr. Mackinnon is of the opinion that the injury sustained after Dr. Klaumann's surgery was a third degree injury and not complete. Dr. Mackinnon believes Keely Foster's injury was a nerve compression superimposed on a retraction injury. Dr. Mackinnon is of the opinion that the neuroma found during Dr. Nath's surgery suggested nerve injury, not transection, and was evidence that the nerve was attempting to recover, but was bundled up in scar tissue. According to Dr. MacKinnon, traumatic neuroma is a third degree injury consisting of a nerve that is trying to regenerate via disorganized nerve fiber, and this was demonstrated by

the pathology report from Dr. Nath's surgery. Dr. Mackinnon believes there was not complete injury to the nerve prior to Dr. Nath's surgery as there was still function of the nerve, particularly with the evertors, and because there was documented motor unit potential in the intraoperative EMG study. Dr. Mackinnon is of the opinion that this is an area of known nerve compression. Dr. Mackinnon believes if, hypothetically, there is a true transection of the nerve, a small nerve graft would repair the transection."

As in the previous disclosure, Dr. Mackinnon reserved the right to supplement her opinions or expand on her opinions based upon additional information that might be reviewed and might become known.

On September 14, 2007, the Fosters moved for an order in limine to exclude from evidence the new disclosures referenced in Dr. Mackinnon's supplement. On September 20, 2007, the Fosters moved to strike Dr. Mackinnon's supplemental disclosures. At a hearing on both motions, the Fosters argued that it would be unfair to permit Dr. Mackinnon to testify without the Fosters having the benefit of her deposition; that her testimony would be cumulative to other defense experts; that she was not qualified to testify to the standard of care for the particular procedure; and that Keely had not consented to the testimony and that such testimony would violate Dr. Mackinnon's duties to Keely.

The trial court denied the Fosters' motion in limine and their motion to strike. The trial court determined that under the particular facts and circumstances of the present case, Dr. Mackinnon should be allowed to testify to the material in the supplemental disclosure. The trial court pointed out that the initial expert disclosure by Dr. Klaumann was that Dr. Mackinnon's opinion testimony would be that Dr. Klaumann did not violate the standard of care. The trial court further pointed out that Dr. Mackinnon had talked to both sides after the initial expert disclosures. The trial court apparently agreed with Dr. Klaumann's argument that there is a difference between a retained expert and a treating expert (Dr. Mackinnon in this case) and that both sides had access to Dr. Mackinnon as a treating expert.

Apparently, the trial court instructed defense counsel to let the Fosters' attorney know when Dr. Mackinnon arrived in town to

testify at trial so that the Fosters' attorney could talk with her, without defense counsel present, about any opinions disclosed in the supplemental expert report. The night before her testimony, Dr. Mackinnon attempted to contact the Fosters' attorney and left a message on his hotel phone, but the Fosters' attorney did not return her call.

During trial and just before Dr. Mackinnon was sworn to testify, the Fosters renewed their motion to limit Dr. Mackinnon's testimony. The trial court reiterated its earlier distinction between expert testimony given by a retained expert and that given by a treating physician. The trial court stated that when a treating physician is going to give expert testimony, the plaintiff has the opportunity to contact and discuss the extent of all aspects of that testimony. In rejecting the Fosters' argument that due process and fundamental fairness required Dr. Mackinnon's testimony to be excluded, the trial judge stated:

"When she gave her opinions in her initial letter, and based upon my ruling, under Kansas law you had the opportunity from the minute she gave her first letter to call her up and discuss with her, of course, at your cost, and ask her to elaborate on those opinions. And you've had that ability as I'm ruling under Kansas law, including, but not limited to, yesterday. So with regard to the due process argument and fundamental unfairness, what I'm saying is that as a matter of Kansas law your due process has been protected in this. And that you have had the legal ability to discover and discuss with her what her opinions are going to be."

As a result, the trial court denied the Fosters' motion to limit Dr. Mackinnon's expert testimony.

The Fosters argue that Dr. Klaumann's supplementary disclosures of Dr. Mackinnon's expert witness testimony violated the scheduling order and, therefore, such testimony should have been excluded. Under the scheduling order, expert witness disclosures "must comply with K.S.A. 60-226." On the other hand, Dr. Klaumann argues that the expert disclosure requirements of K.S.A. 60-226(b)(6) do not apply to Dr. Mackinnon's testimony because she was Keely's treating physician. Dr. Klaumann asserts that there is a significant difference between retained experts and treating experts in this case because the Fosters had every opportunity to discuss the case with Dr. Mackinnon.

In responding to Dr. Klaumann's argument, the Fosters cite several federal cases that have interpreted Rule 26 of the Federal Rules of Civil Procedure. In those cases, the courts have noted that a treating physician who testifies beyond the care and treatment of the patient is subject to the expert disclosure provisions of Fed. R. Civ. Proc. 26(a)(2)(B). See *Gomez v. Rivera Rodriguez*, 344 F.3d 103, 113 (1st Cir. 2003); *Washington v. Arapahoe County Dept. of Soc. Servs.*, 197 F.R.D. 439, 442 (D. Colo. 2000); *Thomas v. Consolidated Rail Corp.*, 169 F.R.D. 1, 2 (D. Mass. 1996). Fed. R. Civ. Proc. 26(a)(2)(B) requires a written expert report "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." As Dr. Klaumann points out, the language in Fed. R. Civ. Proc. 26(a)(2)(B) differs from the language in K.S.A. 60-226(b)(6)(B).

The plain language of K.S.A. 60-226(b)(6)(B) requires disclosure of the "subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion" with respect to a witness "(i) whose *sole connection* with the case is that the witness is retained or specially employed to provide expert testimony in the case or (ii) whose duties as an employee of the party regularly involve giving expert testimony." (Emphasis added.) It is clear that Dr. Mackinnon does not fit within K.S.A. 60-226(b)(6)(B)(ii) because her duties as an employee of a party did not regularly involve giving expert testimony.

Nevertheless, Dr. Mackinnon fits within K.S.A. 60-226(b)(6)(B)(i). Although Dr. Mackinnon had seen Keely for one 15-minute medical appointment as Keely's treating physician, her only real connection with the case was that she was specially employed by the defense to provide expert testimony. She was not used in this case in any capacity other than to provide expert testimony. As a result, it is apparent that Dr. Klaumann was required to comply with the disclosure requirements of K.S.A. 60-226(b)(6)(B) with regard to Dr. Mackinnon.

Dr. Klaumann argues that even if they were required to submit expert disclosures for Dr. Mackinnon, all of their disclosures com-

plied with the timelines set forth in K.S.A. 60-226. It is undisputed that Dr. Klaumann timely made her initial disclosures on May 7, 2007, concerning Dr. Mackinnon's expert disclosures. The real questions are (1) whether Dr. Mackinnon's supplemental disclosures were untimely under the terms of the scheduling order and K.S.A. 60-226(e); and (2) if the supplemental disclosures were untimely, whether the trial court should have limited Dr. Mackinnon's testimony to that disclosed in the May 7, 2007, disclosures.

*Scheduling Order*

Based on the scheduling order, supplemental expert disclosures "may cure an otherwise defective initial disclosure" if done within 10 days after the initial disclosure. The scheduling order further provided: "Except for good cause shown, all supplemental disclosures must be made at least seven days prior to the scheduled deposition of the expert in question."

Here, because the Fosters canceled Dr. Mackinnon's deposition, the language in the scheduling order requiring supplemental disclosures to be made "at least seven days prior to the scheduled deposition of the expert in question" does not apply here. Moreover, the remaining language in the scheduling order relates to curing an "otherwise defective initial disclosure." Here, however, the initial disclosures were not defective. Instead, Dr. Mackinnon's supplemental disclosures expanded on her opinions as contained in the initial disclosures. Dr. Mackinnon's opinions in the initial disclosures were still valid and comported with her testimony in the case.

*Supplemental Expert Disclosures under K.S.A. 60-226(e)(1)*

Since the scheduling order does not cover the supplemental disclosures that were made in this case, K.S.A. 60-226(e) provides guidance on this issue. K.S.A. 60-226(e) imposes a duty on a party to make any additions or other changes to expert disclosures at least 30 days before trial, unless otherwise directed by the court:

"(e) *Supplementation of responses.* A party who has made a disclosure under subsection (b)(6) or responded to a request for discovery is under a duty to supplement or correct the party's disclosure or response to include information thereafter acquired if ordered by the court or in the following circumstances:

"(1) A party is under a duty to supplement at appropriate intervals its disclosures under subsection (b)(6) if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. *With respect to testimony of an expert under subsection (b)(6) the duty extends both to information contained in the disclosure and to information provided through a deposition of the expert, and any additions or other changes to this information shall be disclosed at least 30 days before trial, unless otherwise directed by the court.*" (Emphasis added.)

Here, Dr. Klaumann made the supplemental disclosures to the Fosters on September 7, 2007, which was at least 30 days before trial.

The Fosters maintain, however, that the information in the supplemental disclosures was not "thereafter acquired," as required by K.S.A. 60-226(e). The record does not support the Fosters' argument. At the motion in limine hearing, defense counsel specifically told the trial court that they had filed their initial disclosures as soon as they had learned that Dr. Mackinnon's opinion went beyond her consultation, care, and treatment but before she had reviewed all the files and records in the case. Defense counsel then sent the records to Dr. Mackinnon for her review. Indeed, Dr. Mackinnon's trial testimony indicated that her initial opinion was rendered before she had a chance to review all records and deposition testimony in the case. Defense counsel sent the Fosters the supplemental disclosures after Dr. Mackinnon had reviewed the additional records in the case. As a result, the information contained in the supplemental disclosures had been "thereafter acquired" under K.S.A. 60-226(e).

*Discovery Sanctions*

Assuming *arguendo* that the timelines identified in the scheduling order apply here and that Dr. Mackinnon's supplementary disclosures were untimely, the trial court did not abuse its discretion in refusing to limit Dr. Mackinnon's testimony to those opinions contained in her initial disclosures.

The trial court is vested with broad discretion in supervising the course and scope of discovery. The trial court has discretion on the admission or exclusion of evidence, and the trial court's decision

will not be overturned on appeal absent a showing of abuse of that discretion. *Olathe Mfg., Inc. v. Browning Mfg.*, 259 Kan. 735, 768, 915 P.2d 86 (1996).

Although the Fosters cite K.S.A. 60-237(c)(1) for authority that the trial court should not have allowed Dr. Mackinnon to testify to the opinions in her supplemental disclosures, that statutory provision applies where there has been a *failure* to disclose expert testimony. K.S.A. 60-237(c)(1) states as follows:

"A party that without substantial justification fails to disclose information required by subsection (b)(6) or (e)(1) of K.S.A. 60-226, and amendments thereto, shall not, unless such failure is harmless, be permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed."

Here, however, there was not a failure to disclose the expert information. Dr. Klaumann timely disclosed Dr. Mackinnon's opinions that Dr. Klaumann did not deviate from the standard of care. Then, after Dr. Mackinnon had reviewed the records in the case, Dr. Klaumann disclosed the supplemental information that she had learned from Dr. Mackinnon concerning those opinions. The supplemental disclosures, which did not change Dr. Mackinnon's original opinion that Dr. Klaumann complied with the standard of care, met the requirement of K.S.A. 60-226(e)(1) because they were disclosed more than 30 days before trial. Based on those circumstances, the trial court did not abuse its discretion in refusing to limit Dr. Mackinnon's testimony to that contained in her initial disclosures.

## Dr. Mackinnon's Trial Testimony

The Fosters further argue that part of Dr. Mackinnon's testimony was outside of her initial and supplementary disclosures. Specifically, the Fosters point out that Dr. Mackinnon was allowed to classify Keely's nerve injury as a fourth-degree and sixth-degree injury. Moreover, the Fosters contend that Dr. Mackinnon's pretrial disclosures did not mention a specific nerve, nerve branch, or the motor and sensory functions they supply.

Nevertheless, the Fosters never objected to this testimony on the ground that it was outside of the expert disclosures. Although the Fosters objected at one point to testimony about a sixth-degree

injury, the Fosters conceded, through their attorney, that they had no problem with Dr. Mackinnon explaining a sixth-degree injury:

"[Fosters' attorney:] Your Honor, I thought she said she believed this was a fourth-degree. If she's going to say it's a sixth-degree, that's never been disclosed to us.

"[Defense counsel:] She's explaining what a sixth-degree injury is.

"[Fosters' attorney:] I have no problem with that.

"THE COURT: All right. If you don't have a problem with her explaining what a sixth-degree is, that's fine."

When Dr. Mackinnon proceeded to testify that Keely had a sixth-degree injury, the Fosters' attorney did not raise their objection again. In order to preserve the issue for appeal, a party must make a timely and specific objection. *State v. Anthony*, 282 Kan. 201, 206, 145 P.3d 1 (2006); see K.S.A. 60-404. During the rest of the complained-of testimony, the Fosters objected once on the ground of speculation. A party may not object at trial to the admission of evidence on one ground and then on appeal argue a different ground. *Butler v. HCA Health Svcs. of Kansas, Inc.*, 27 Kan. App. 2d 403, 435, 6 P.3d 871, *rev. denied* 268 Kan. 885 (1999). As a result, it appears that the Fosters' argument that Dr. Mackinnon's testimony exceeded the scope of her disclosures is not properly before this court.

Moreover, it is difficult to understand the Fosters' argument that Dr. Mackinnon's disclosures did not reveal any opinions specific to the deep peroneal nerve. One of the main issues in this case was whether Dr. Klaumann had transected Keely's deep peroneal nerve. The undisputed evidence by all of the experts in this case was that Keely's inability to dorsiflex her foot was caused by an injury to her deep peroneal nerve. Dr. Nath's deposition testimony, which was given nearly 6 months before Dr. Mackinnon's initial disclosures, discussed in depth his findings, which he believed showed that Keely's deep peroneal nerve had been transected. As a result, although Dr. Mackinnon talked about a "nerve" in her disclosures, it was clear that most of her disclosures involved the deep peroneal nerve.

Furthermore, expert disclosures are not meant to disclose every detail of testimony that an expert is expected to give. See K.S.A.

60-226(b)(6)(B) (requiring expert disclosures to "state the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion"). Dr. Mackinnon's testimony concerning a sixth-degree injury, which was a combination of the first five degrees of injury, explained that Keely's peroneal nerve had different degrees of injury. For example, the part of Keely's peroneal nerve that got better in 3 months was a first-degree injury, but the other parts of the nerve had a more severe injury. Consistent with her disclosures, Dr. Mackinnon explained that Dr. Nath's findings indicated that Keely had suffered a bad third-degree injury. Nevertheless, Dr. Mackinnon acknowledged that the injury could have been more severe and a fourth-degree or fifth-degree injury like Dr. Nath treated it. Thus, Dr. Mackinnon's testimony on this matter was consistent with her expert disclosures and not a new opinion on Keely's injury.

*IV. Violation of the Order in Limine*

Next, the Fosters contend that Dr. Klaumann violated the trial court's orders in limine by eliciting opinion testimony blaming Dr. Nath for permanently damaging Keely's deep peroneal nerve and by introducing evidence that Keely's osteochondroma, if left alone, would cause permanent injury. The Fosters maintain that they were substantially prejudiced by the violations of the orders in limine.

When a party alleges that an order in limine has been violated, the trial court must determine (1) whether the order has been violated and, if so, (2) whether the party alleging the violation has established substantial prejudice resulting from that violation. *City of Mission Hills v. Sexton*, 284 Kan. 414, 436, 160 P.3d 812 (2007). Because the trial court is in the best position to determine whether a violation occurred and to determine the degree of prejudice any violation may have caused, the trial court's determination on these matters will not be disturbed absent a clear abuse of discretion. *Steinman v. Krisztal*, 247 Kan. 324, 328, 799 P.2d 475 (1990).

*Evidence Regarding Dr. Nath's Surgery—Dr. Jones' Testimony*

Before trial, the Fosters moved for an order in limine to preclude Dr. Klaumann and her witnesses "from attempting to blame anyone else, in whole or in part, for causing or contributing to Keely's injuries. This specifically includes questioning or criticizing Dr. Nath's care and treatment of Keely." At the motion in limine hearing, defense counsel told the trial court that he had no intention of suggesting that Dr. Nath was at fault and that he was not going to try to blame Dr. Nath for Keely's outcome. Defense counsel further stated that the defense wanted to be able to talk about the options that Dr. Nath had and the options that were selected in order to show that this had not been a complete transection. The trial court ruled that evidence could be presented about the choices that Dr. Nath had made during the surgery and the reasons for those choices as they related to the nature and the extent of Keely's injuries presented to Dr. Nath. The trial court further ruled that the defense would not be allowed to suggest that any end result that Keely had suffered was due to a choice made by Dr. Nath or Keely's parents or that Dr. Nath's surgery was the wrong procedure.

Dr. Eric Jones was called as an expert witness. Dr. Jones testified about two surgeries that he had performed that had resulted in complete nerve palsy immediately after the surgery. According to Dr. Jones, in each of those cases, the nerve function returned without surgical nerve repair. Dr. Jones testified that in one case where he had to stretch the peroneal nerve, it took 3 or 4 months before the patient showed the first signs of any return of nerve function. In that case, all of the nerve function eventually returned except for the patient's toe extension. Dr. Jones indicated that it was common to stretch the peroneal nerve in this type of surgery.

Dr. Jones testified that his review of Keely's medical records showed that there had been some return of function to her superficial peroneal nerve branch. When questioned about whether Dr. Klaumann was justified in waiting to see if there was further return of function, Dr. Jones testified as follows:

"I certainly would have waited at least three or four months with that, knowing that I protected the nerve when I did the surgery. And I mean I can tell you that

I've seen patients where it doesn't come back until then. And the superficial part will start coming back and the deep part will be much later. But as long as you're seeing some improvement steadily, I think you can observe it."

Defense counsel then proceeded to question Dr. Jones about whether he had any criticism if surgery had been performed 3 months and 4 days after Dr. Klaumann's surgery:

"[Defense counsel:] Surgery—jumping ahead a little bit, if surgery was performed on Keely in an attempt to repair her deficit at about three months and four days, do you have—first of all, do you have any criticism at all of the decision that was made to explore at three months?
"[Dr. Jones:] Yes, I do. I mean I don't—I think that was too soon. I think she was getting nerve recovery. And I think that—I mean the surgery that they did was to take something that was recovering and put into something else—"

At that point, the Fosters' attorney objected to Dr. Jones' testimony based on the order in limine. The trial court directed defense counsel to rephrase his question.

Defense counsel then asked Dr. Jones to clarify that he had no opinions regarding Dr. Nath's care of Keely:

"[Defense counsel:] Is it true, doctor, you have no opinions regarding the care of Dr. Nath in terms of his surgery or the reasons or indications for the surgery?
"[Dr. Jones:] No opinions?
"[Defense counsel:] You are not expressing any opinions and do not intend to express any opinions that Dr. Nath deviated from the applicable standard of care, are you?
"[Dr. Jones:] No."

The Fosters' attorney then requested argument outside of the presence of the jury. The Fosters' attorney moved to strike the question and the answer and asked the trial court to admonish the jury to disregard Dr. Jones' testimony concerning his criticism of Dr. Nath. In addition, the Fosters' attorney asked that the trial court make clear that Dr. Jones was not a witness who was there to criticize or comment on Dr. Nath's surgery. The trial court pointed out that the defense was entitled to introduce evidence about when a physician should perform surgery to comply with the standard of care. The trial court noted, however, that the order in limine was intended to ensure that a witness did not criticize the

decision by Dr. Nath to perform the surgery when he did or to criticize the actual performance of the surgery.

The trial court struck Dr. Jones' testimony concerning his criticism of Dr. Nath's surgery and instructed the jury as follows:

"[T]he jury is to disregard any testimony which this witness may have inferred or suggested a criticism of the care given by Dr. Nath including, but not limited to, the timing of Dr. Nath's surgery. Any prior question and answer with regard to that issue has been stricken from this record."

Here, the trial court recognized that there had been a clear violation of its order in limine. The trial court immediately rectified this violation by doing exactly what the Fosters had asked—admonishing the jury to disregard Dr. Jones' testimony that violated the order in limine and also striking this testimony from the record. Although the Fosters had also asked the trial court to admonish the jury that Dr. Jones was not there to comment on Dr. Nath's surgery, this information was not covered by the order in limine, and such an admonishment would have been improper. The trial court's decision to admonish the jury and to strike the testimony from the record, as requested by the Fosters, cured any substantial prejudice that resulted from Dr. Jones' isolated statement. See 3 Barbara, Kansas Law and Practice, Lawyer's Guide to Kansas Evidence § 1.4, p. 10 (5th ed. 2007) ("An admonition to the jury normally cures the prejudice from an improper admission of evidence."). As a result, there was no abuse of discretion by the trial court.

*Evidence Regarding Dr. Nath's Surgery—Dr. Mackinnon's Testimony*

Later during trial and before Dr. Mackinnon's testimony, the Fosters argued that Dr. Mackinnon's expert testimony implicated the order in limine with respect to whether Dr. Nath's surgery was done improperly and caused further injury to Keely. The trial court instructed Dr. Mackinnon that she was not in any way to suggest that Dr. Nath was responsible for the end result of Keely's condition. The trial court further emphasized that the care and treatment of Dr. Nath was not going to be presented as an issue in the case. The trial court cautioned defense counsel to be extremely

careful about eliciting testimony that would suggest to the jury any fault in the legal sense on the part of Dr. Nath.

The Fosters point to several places in the record where they claim Dr. Mackinnon violated the court's order in limine. Although the Fosters claim that they repeatedly objected to this testimony, their objections were based on relevance, lack of foundation, speculation, and improper narrative testimony. The Fosters did not object to this testimony as violative of the order in limine. A party may not object at trial to the admission of evidence on one ground and then on appeal argue a different ground. See *Butler*, 27 Kan. App. 2d at 435; 3 Barbara, Kansas Law and Practice, Lawyer's Guide to Kansas Evidence § 1.4, p. 10 ("A party cannot object to the introduction of evidence on one ground at trial and then assert a different ground on appeal."). As a result, the Fosters' argument concerning Dr. Mackinnon's testimony is not properly before this court.

Moreover, even if the Fosters' argument was properly before this court, there was no violation of the order in limine during Dr. Mackinnon's testimony. Part of Dr. Klaumann's defense was to show that she had not sharply transected the deep peroneal nerve and that she had acted within the standard of care in monitoring the nerve postoperatively. Part of this defense included showing that Dr. Nath, based on his findings and reports, had not found the nerve sharply transected when he had performed the surgery. Dr. Mackinnon's testimony was relevant to Dr. Klaumann's defense and did not cross the line into placing fault on Dr. Nath for Keely's injury.

Specifically, Dr. Mackinnon explained in detail why she believed that Dr. Nath's findings, the nerve conduction testing, the traumatic neuroma that he had removed from Keely, and the procedure he had ultimately performed indicated that there had not been a clear transection to the deep peroneal nerve. Dr. Mackinnon further explained that based on Keely's medical records and Dr. Nath's reports, she believed that Keely had suffered a sixth-degree injury, which was a combination of different degrees of injury, to the deep peroneal nerve. Dr. Mackinnon testified that

part of Keely's nerve injury could have been a severe third-degree injury, a fourth-degree injury, or a fifth-degree injury.

According to Dr. Mackinnon, Dr. Nath's testing, which showed a small response from the muscle controlled by the deep peroneal nerve branch, indicated that a component of the deep peroneal nerve was starting to get better. Moreover, testing of the traumatic neuroma showed that nerves were generating right up to the level of where Dr. Nath cut the neuroma. Nevertheless, Dr. Mackinnon's testimony indicated that the level of injury to Keely's deep peroneal nerve might not have been known until years down the road, depending on the return of function. Dr. Mackinnon testified that a patient cannot wait years for the return of function because the muscle will not wait.

After explaining why she believed that Keely's deep peroneal nerve injury was not a sharp transection, Dr. Mackinnon offered praise to Dr. Nath for his skill as a surgeon and technician and his ultimate decision, based on his findings, to perform the nerve transfer. According to Dr. Mackinnon, Dr. Nath "in his great experience" made the "wise" decision, based on his findings during the exploration phase of the surgery, that there were not enough fibers to make the peroneal nerve work again and performed the nerve transfer.

In summary, Dr. Mackinnon's testimony pointed out that Dr. Nath's findings and reports indicated that Dr. Klaumann had not sharply transected Keely's deep peroneal nerve. Because Dr. Mackinnon did not criticize Dr. Nath's decision to do the nerve transfer or place fault on Dr. Nath for Keely's deep peroneal nerve injury, there was no violation of the trial court's order in limine.

*Testimony Concerning Permanent Injury*

Next, the Fosters argue that Dr. Klaumann violated the order in limine not to present evidence or suggest that leaving the osteochondroma between the tibia and fibula alone could cause a permanent injury.

Before trial, the Fosters moved for an order in limine for the defense to be precluded from suggesting or arguing that osteochondromas present a risk of nerve injury if not removed. In re-

sponding to the Fosters'.motion in limine, Dr. Klaumann pointed out that she was not going to try and take the position that osteochondromas would cause *permanent* nerve problems. Nevertheless, Dr. Klaumann argued that she had medical literature showing that osteochondromas could cause nerve impairment, such as dropfoot, which could be treated. The trial court granted the Fosters' motion in limine in part and ruled that Dr. Klaumann could not argue or present testimony that the osteochondromas could cause *permanent* nerve injury. Nevertheless, the trial court determined that Dr. Klaumann could present testimony as to why she had recommended the procedure.

The Fosters point to several places in the record where they claim that the testimony and argument violated the trial court's order in limine not to present evidence that the osteochondromas could cause permanent nerve damage. Nevertheless, during only one of the testimonies was an objection made, and the objection was based on foundation. A party may not object at trial to the admission of evidence on one ground and then on appeal argue a different ground. *Butler*, 27 Kan. App. 2d at 435. The Fosters raised no objection to the rest of the testimony or to Dr. Klaumann's closing argument. In order to preserve the issue for appeal, a party must make a timely and specific objection. *Anthony*, 282 Kan. at 206. As a result, the Fosters' argument concerning the complained-of testimony is not properly before this court.

Moreover, even if the Fosters' argument was properly before this court, it is apparent that there was no violation of the order in limine. Although there was some testimony that osteochondromas could cause nerve damage, Dr. Klaumann did not elicit testimony that the nerve damage was permanent. Moreover, it is difficult to see how the Fosters were prejudiced by this testimony when Dr. Klaumann's own expert, Dr. Jones, testified that it was uncommon for osteochondromas to cause nerve damage and that it was not very likely that Keely's osteochondromas would have caused her to have the nerve impairment of footdrop if left untreated. As a result, this court should not grant relief to the Fosters on this issue.

*V. Requested Jury Instructions*

Next, the Fosters argue that the trial court erred in refusing to give their proposed Instruction No. 12 regarding informed consent

and proposed Instruction No. 11 regarding liability for a recommended surgery.

When the trial court declines to give a requested jury instruction, an appellate court applies the following standard of review:

"The trial court is required to properly instruct the jury on a party's theory of the case. Errors regarding jury instructions will not demand reversal unless they result in prejudice to the appealing party. Instructions in any particular action are to be considered together and read as a whole, and where they fairly instruct the jury on the law governing the case, error in an isolated instruction may be disregarded as harmless. If the instructions are substantially correct and the jury could not reasonably have been misled by them, the instructions will be approved on appeal. [Citation omitted.]" *Wood v. Groh*, 269 Kan. 420, 423-24, 7 P.3d 1163 (2000).

*Informed Consent*

The "informed consent" doctrine is contained in PIK Civ. 4th 123.14 "Disclosure and Consent—Duty of Health Care Provider." Here, in Instruction No. 10, the trial court instructed the jury on the first paragraph of PIK Civ. 4th 123.14, which is the applicable paragraph here, and also added language pertaining to negligence and fault:

"A physician has a duty to make a reasonable disclosure to the patient of the nature and probable consequences of the suggested or recommended treatment including the dangers within his or her knowledge which are possible in the treatment proposed. This disclosure is required so the patient can make an intelligent informed consent to the proposed treatment. The duty of the physician to disclose is limited to those disclosures which a physician would reasonably make under the same or similar circumstances.

"A violation of this duty is a violation of the duty of a health care provider and is negligence.

"A party is at fault when he or she is negligent and that negligence caused or contributed to the event which brought about the injury or damages for which claim is made."

The Notes on Use for PIK Civ. 4th 123.14 state that this instruction "covers the duty of a physician, dentist, anesthesiologist or other specialist to disclose fully those facts necessary for the patient to make an informed consent to a proposed course of treatment."

Although the Comments to PIK Civ. 4th 123.14 state that the instruction is based on the informed consent doctrine as estab-

lished in *Natanson v. Kline*, 186 Kan. 393, 350 P.2d 1093, *clarified and reh. denied* 187 Kan. 186, 354 P.2d 670 (1960), the Fosters maintain that the PIK instruction does not fully incorporate the rule in *Natanson*.

The Fosters argue that the trial court erred in refusing to substitute the following requested Instruction No. 12 for the instruction based on PIK Civ. 4th 123.14:

"If you find that proper informed consent was not obtained, the physician performing the procedure is liable for any unfavorable consequences, irrespective of whether the physician was negligent, if a reasonable person in the patient's circumstances would have refused the procedure if given the information which was not given to the patient."

This requested instruction does not properly state the law in this area because it imposes strict liability upon a physician under certain circumstances "irrespective of whether the physician was negligent." The requested instruction, although not following the exact language in the first *Natanson* opinion, seems to be based on our Supreme Court's directive in that case. See 186 Kan. at 410-11. The directive language was incorporated into Syllabus 4 of the first *Natanson* opinion. Our Supreme Court, however, later clarified that language in the second *Natanson* opinion. See 187 Kan. 187-91. Our Supreme Court made clear that "[n]egligence is an essential element of malpractice" and "a causal relationship must be established by the patient, *between the negligent act of the physician* and the injury of the patient, to sustain the burden of proof where damages are sought in a malpractice action for injury." (Emphasis added.) 187 Kan. at 190. See *Funke v. Fieldman*, 212 Kan. 524, 537, 512 P.2d 539 (1973).

An application of the language from the second *Natanson* decision to the instant case leads to the conclusion the Fosters still needed to show that Dr. Klaumann's *negligence* in failing to inform them of the known risks of Keely's surgery was the proximate cause of Keely's injury. Importantly, there is language in the second *Natanson* opinion indicating that there is sufficient evidence to establish the proximate cause element in a medical malpractice action if the evidence shows that the plaintiff would not have undergone the treatment had he or she been properly informed of the risks.

187 Kan. at 191. Although the last part of the Fosters' instruction comes close to this language, the language "irrespective of whether the physician was negligent" was not a proper statement of the law in this area and could have misled the jury.

The trial court's instruction, which was based on PIK Civ. 4th 123.14, correctly stated the law on the duty of informed consent and the causal relationship that must be established between a negligent act and the injury sustained. "Trial courts are not required to use PIK instructions, but it is strongly recommended because the instructions were developed in order to bring accuracy, clarity, and uniformity to jury instructions. Modifications or additions should only be made if the particular facts of a case require it. [Citation omitted.]" *State v. Hebert*, 277 Kan. 61, 87, 82 P.3d 470 (2004). The trial court in this case properly refused to replace its jury instruction based on PIK Civ. 4th 123.14 with the Fosters' requested instruction on informed consent.

*Proposed Jury Instruction No. 11*

Next, the Fosters argue that the trial court erred in refusing to give the following requested Instruction No. 11:

"If you find that all of part of the surgery recommended by the Defendant was not indicated, the Defendant is liable for its consequences even if the patient agreed to undergo the operation and irrespective [of] whether it was conducted appropriately within the applicable standard of care."

The Fosters cite no authority in Kansas to support the requested instruction. The only case cited by the Fosters in their appellate brief as authority for their requested instruction is *Waller v. Aggarwal*, 116 Ohio App. 3d 355, 688 N.E.2d 274 (1996). Nevertheless, nowhere in *Waller* does the court impose the strict liability rule that is contained in proposed Instruction No. 11. Instead, the court in *Waller* determined that the fact that the defendant informed the plaintiff that a certain injury was a possible risk of the procedure could not be a defense to the plaintiff's negligence. As a result, the court held that the issue of informed consent was irrelevant to the plaintiff's claim of negligence. 116 Ohio App. 3d at 357-58.

As Dr. Klaumann points out, requested Instruction No. 11 is not the law in Kansas, and the trial court properly refused to give the instruction.

## IV. Evidence to Support the Verdict

Finally, the Fosters contend that the jury's verdict in this case was contrary to the law and evidence. Nevertheless, because we are reversing and remanding the case for a new trial, this issue is now moot and we will not address it further.

Reversed and remanded for a new trial.

\* \* \*

PIERRON, J., dissenting: I respectfully dissent from the portions of the majority decision that call for a new trial because the trial court gave certain standard jury instructions.

PIK Civ. 4th 123.01 and PIK Civ. 4th 123.12 were given over the plaintiffs' objection, although they alleged the giving of PIK Civ. 4th 123.01, which could be called the general standard of medical negligence, might confuse the jury. They contended that PIK Civ. 4th 123.12 is the only proper instruction that should have been given because the case involved the standard of care for specialists, which is the focus of PIK Civ. 4th 123.12.

A reading of PIK Civ. 4th 123.01 in no way could cause a jury to ignore or misinterpret the importance of PIK Civ. 4th 123.12. At worst it is surplusage. The two have been given together in other cases involving specialist care and have been approved, as set out in the majority opinion. The giving of PIK Civ. 4th 123.01 in addition to PIK Civ. 4th 123.12 was not reversible error, if it was error at all.

The majority would also have the case retried because of the use of PIK Civ. 4th 123.11, the best judgment instruction. This instruction sets out the law for situations described in the instruction. The majority cites Kansas cases that have found this instruction to be appropriate. Although other states may find some fault with some form of this instruction, as set out by the majority, there is nothing

to indicate that Kansas appellate court approval for this Pattern Instruction has waned.

I would affirm.